SPENCER D. STEWART AND MARY JANE STEWART, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Stewart v. Commissioner
Docket No. 1697-78.
United States Tax Court
T.C. Memo 1982-209; 1982 Tax Ct. Memo LEXIS 532; 43 T.C.M. (CCH) 1119; T.C.M. (RIA) 82209; April 21, 1982. James Powers, for the petitioners. Brad S. Ostroff, for the respondent. KORNER
MEMORANDUM FINDINGS OF FACT AND OPINION KORNER, Judge:* Respondent determined deficiencies in petitioners' Federal income taxes of $ 210,751.13 for 1966 and $ 45,444.21 for 1967. After concessions by the parties, the remaining issues for decision are: *533 (1) whether the interest received by petitioners during 1966 from the City of Phoenix is excludible under section 103(a); [1] and (2) whether the gain on the sale of certain securities transferred by petitioner Spencer D. Stewart to John Porter Manufacturing Co., and sold by it on the same days when transferred, is attributable to petitioners for income tax purposes. FINDINGS OF FACT Some of the facts have been stipulated and are so found. Spencer D. Stewart ("petitioner") and Mary Jane Stewart, husband and wife, resided in Phoenix, Arizona, when they filed their petition. During calendar years 1966 and 1967, petitioners timely filed joint Federal income tax returns and paid in full the tax liabilities shown to be due thereon. **
*534 I In 1943 or 1944, petitioner purchased various water utilities under the name of Consolidated Water Company ("Consolidated"). Consolidated supplied water through underground pipes to households on the outskirts of Phoenix. The Phoenix municipal water department provided service to residents within the city. Consolidated was wholly owned by the petitioner. During the 1950's, the city's boundaries expanded considerably so that part of the area serviced by Consolidated became located within the Phoenix city limits. As a result, petitioner sold several water systems to the City of Phoenix ("City") prior to 1961. In 1961 or early 1962, the City began negotiations with petitioner to acquire additional portions of the Consolidated system, serving an area of northwest Phoenix recently annexed by the City. In the early part of 1962, the City made an offer to petitioner which he refused. On July 2, 1962, the City instituted a condemnation action in the Superior Court of the State of Arizona, Maricopa County ("Superior Court"), to condemn Consolidated's water system serving this area, and to determine its value. After the commencement of the condemnation action in Superior Court, *535 the parties entered into Agreement No. 6905 ("Agreement"). Both parties had different reasons for entering into the Agreement. The City wanted to take immediate possession of the condemned portion of the Consolidated system and did not wish to post a bond two and one-half times the value of the property, as provided by existing Arizona statutes. Petitioner realized that the loss of his property was inevitable, and desired to obtain funds quickly. The Agreement was accordingly entered into as part of, and in the overall context of the condemnation action in the Superior Court. The final Agreement between petitioner and the City provided, inter alia, that the Superior Court would proceed to dispose of the condemnation action and determine the exact amount of the award. [2] The agreement further provided: (d) Any sums which become payable by either party to the other under the terms of the final judgment entered in said condemnation action (and *536 after deduction of credits to which the judgment debtor is entitled) shall bear interest at the statutory rate of six percent per annum from the date City obtains possession of said utility property to the date of payment by the judgment debtor. Pending final action by the Superior Court, petitioner received $ 1,750,000 in cash contemporaneously with the transfer of possession of the condemned property to the City. The City also agreed to assume certain additional financial obligations of the petitioner. The total amount paid to or for petitioner's benefit was stated to be $ 2,450,000. The City in turn, was allowed to finance all or a portion of the final award granted petitioner by the Superior Court through the issuance of water revenue bonds. On July 23, 1962, the Superior Court entered an Order approving the Agreement and incorporated the Agreement as a part of the condemnation proceedings. On September 3, 1964, the Superior Court entered a $ 3,400,000 judgment in favor of petitioner which the City appealed. On June 22, 1966, the Arizona Supreme Court affirmed the Superior Court's judgment. On October 18, 1966, in satisfaction of the above judgment, the City paid petitioner *537 an additional $ 1,180,611.61 of which $ 239,137.06 [3] represented interest as required by the Agreement. Petitioners excluded the interest payment froim their 1966 Federal income tax return on the basis that the interest was excludible from gross income under section 103. Upon audit of petitioners' 1966 return, respondent determined that such interest was taxable ordinary income to petitioners in 1966. II Prior to March 15, 1962, petitioner acquired controlling stock interests in two corporations, John Porter Manufacturing Company ("JPMC") and N. Porter Mercantile Company ("Porters"). JPMC was engaged in the manufacture of western wear and Porters was a retail operation engaged in the business of selling saddles, western clothing and related items. Porters subsequently filed a petition in the bankruptcy court and was adjudicated bankrupt. JPMC purchased some of the retail outlets from Porters bankruptcy estate and began its own retail operations. JPMC reported net operating losses for fiscal years ended June 30, 1962, to June 30, 1966, as follows: Fiscal Year Ended
Net Income
June 30
or (Loss)
1962
( 9,574.39)
1963
( 86,053.00)
1964
(110,299.00)
1965
( 31,521.11)
1966
(117,894.31)
*538 As of June 30, 1967, JPMC had available net operating loss carryovers of $ 326,272.32. Petitioners wanted to strengthen JPMC's financial position in order to aid its continued operation. The Corporation's "Balance Sheet" for June 30, 1966, reflected the following liabilities: Bank Overdrafts
$ 9,506.59
Accounts Payable
30,548.88
Notes and Contracts
34,659.04
Accrued Taxes Payable
10,327.35
Mortgages Payable on
"Apacheland" Property
Home Savings & Loan
$ 89,000.00
Spencer Stewart
111,763.00
200,763.00
Other Land & Buildings
25,996.45
Note Payable to Spencer
Stewart
56,602.17
$ 368,403.48
JPMC's books and records reflect that on August 1, 1966, the "Apacheland" property was acquired by Wilderness Enterprises, in consideration of the assumption of the remaining mortgage debt on the property. This eliminated JPMC's largest debt then outstanding. Prior to January 1, 1967, petitioner had advanced or caused other corporations or partnerships which he controlled to advance money to JPMC. At December 31, 1966, the balances of such debts were as follows: Creditor
Amount
Petitioner
$ 224,284.00
Stewart Motors
8,700.00
B. Bar L Land & Cattle Co.
(later called Stewart
Property Management Co.)
and Stewart Management
Company
140,753.20
Moo Soo Ranch
3,000.00
Wilderness Enterprises
1,028.97
Consolidated Water Company
6,041.97
TOTAL
$ 383,808.14
*539 Petitioner personally guaranteed all loans made to JPMC. At June 30, 1965, JPMC's balance sheet showed that it owed petitioner $ 313,559.60, all of which was subordinated to the claims of other creditors. Petitioner agreed to convert $ 230,000 of this indebtedness into an equal amount of JPMC preferred stock, but no stock certificates were actually prepared or issued to the petitioner. Nevertheless, it was apparnelty treated as though the stock had been issued, and $ 230,000 was transferred from debt to capital account on JPMC's books. In December, 1966, entries were made on JPMC's records showing that JPMC called in and cancelled $ 230,000 in preferred and $ 10,000 in common stock and increased its retained earnings account (which was a deficit) by $ 240,000. This cancellation covered all of JPMC's outstanding stock. Early in 1967, petitioner transferred to JPMC the following publicly trades stocks, which he personally owned, which JPMC, as purported owner, sold on the same day: Date Transferred
Petitioner's
to JPMC and Date
Number
Basis in
Net Sales
Net Capital
of Sale by JPMC
of Shares
Securities
Proceeds
Gain
1/03/67
1,441
$ 4,445.51
$ 45,397.71
$ 40,952.20
1/17/67
2,000
6,170.04
64,029.77
57,859.73
2/07/67
2,000
6,170.04
66,742.09
60,572.05
3/02/67
2,000
13,629.22
28,570.00
14,940.78
3/02/67
2,000
10,400.01
64,300.82
53,900.81
$ 40,814.82
$ 269,040.39
$ 228,225.57
*540 In exchange for the stock, JPMC issued 4,000 shares of $ 10 par common stock to petitioner. JPMC used part of the above proceeds to purchase, and promptly resell, certain other securities, at a net loss of $ 769.99. Thus, the net proceeds of all these stock transactions to JPMC was $ 268,270.40. The record [4] establishes that JPMC used some of the sales proceeds to repay $ 42,500 to petitioner, $ 69,637.86 to Stewart Property Management Co. ("SPMC"), a company in which petitioner then owned a 45 percent interest, [5] $ 74,835.41 to Consolidated Water Co., a sole proprietorship business owned by petitioner, and $ 22,633 to Valley National Bank ("VNB"). In turn, of the sale proceeds given to SPMC by JPMC, $ 10,000 was paid to VNB and $ 12,300 was given to petitioner. The $ 74,835.41 paid to Consolidated Water Co. ("Consolidated") by JPMC was, in turn, distributed by Consolidated (together with additional funds) to SPMC and VNB in the amounts of $ 52,503.79 and $ 46,435.41, respectively. The record does not establish that a single JPMC creditor, other than petitioner or businesses that petitioner owned or controlled, was paid any of the proceeds from the sale of these stocks. *541 The record does not establish that VNB, the other identifiable distributee, was a creditor of JPMC. The distribution to Consolidated was, in fact, more than 12 times larger than JPMC's debt to Consolidated. After the above distributions of the stock sales proceeds were made, JPMC retained for its own use not more than $ 35,193.34. The company went out of business in 1970. In its tax return for its fiscal year ending June 30, 1967, JPMC reported net capital gains from the above stock transactions in the amount of $ 228,225.57. JPMC then reported net income for the year of $ 173,390.07, which was fully absorbed by its net operating loss carryforwards from prior years, in the amount of $ 326,272.32. As a result, JPMC paid no income tax for 1967. Respondent's deficiency notice states: It is determined that you realized a capital gain of $ 228,225.57 *542 in the tax year 1967 when you transferred various securities to John Porter Manufacturing Co., purportedly within the purview of Sec. 351 of the Code. It is determined that such transfer was for the purpose of avoidance and/or evasion of taxes. Accordingly, the long-term capital gain realized thereon of $ 228,225.57 is reallocated to you within the purview of Sec. 482 of the Internal Revenue Code. Respondent's trial memorandum, received by the petitioners prior to trial, states the issue and the legal principle involved as follows: ISSUE 2. Whether capital gain in the amount of $ 228,225.57 realized on the sale of stock by John Porter Manufacturing Co. on the same day as contributed to it by petitioner Spencer D. Stewart is taxable to petitioners. LEGAL PRINCIPLE 2. The transfer of appreciated property followed by the sale of such property by the transferee will be treated for tax purposes as a sale by the transferor where such transferee was used merely as conduit through which to pass title. Commissioner v. Court Holding Co.,324 U.S. 331 (1945); *543 Hallowell v. Commissioner,56 T.C. 588 (1971). Petitioners were the true sellers of the securities transferred by them to JPMC in January, February and March, 1967, and sold on the same days when transferred. OPINION I Section 103(a)(1), as it read in 1976, provided for an exclusion from a taxpayer's gross income for interest on … the obligations of a State, a Territory, or a possession of the United States, or any political subdivision of any of the foregoing, or of the District of Columbia;…. However, section 103(a)(1) applies only to interest paid on obligations incurred in the exercise of the governmental unit's borrowing power. By contrast, a condemnation action is the exercise of the government unit's eminent domain power. Therefore, interest on a condemnation award is not excludible under this provision. Holley v. United States,124 F.2d 909 (6th Cir. 1942), cert. denied 316 U.S. 685; Drew v. United States,551 F.2d 85, 87 (5th Cir. 1977); United States Trust Co. of New York v. Anderson,65 F.2d 575, 577-578 (2d Cir. 1933), *544 cert. denied 290 U.S. 683 (1933); Newman v. Commissioner,68 T.C. 433 (1977). We have found that the Agreement was integral to the condemnation proceedings and not a separate arrangement as alleged by petitioner, and this is determinative of the issue. The provision in the Agreement that provides for interest at the statutory rate of six percent is based on the terms of the final judgment entered in the condemnation action.The Agreement merely provided a means for petitioner to obtain funds quickly and for the City to take immediate possession of Consolidated properties without the posting of a bond. To separate the interest obligation from the condemnation award would be to ignore the express language of the Agreement. Therefore, the interest received by petitioner as a part of the condemnation award is taxable income, not included within the exclusion provided by section 103(a)(1). Holley v. United States,supra;Isham v. Commissioner,26 B.T.A. 1040 (1932); King v. Commissioner,77 T.C. 1113 (1981). II The remaining issue relates to the exchange of petitioner's personal securities, *545 valued at $ 269,040.39, and in which he had a cost basis of $ 40,814.82, for 4,000 shares of JPMC common stock, followed immediately by the sale of such stock by JPMC. First, however, we must address a procedural complaint which petitioner raised in his reply brief, i.e., whether respondent's reliance on a substance-over-form argument signifies the abandonment of the section 482 issue raised in respondent's statutory notice of deficiency. Petitioner claims that respondent's reliance on the substance-over-form argument is a new issue which should not be considered by the Court since the advancement of this argument has both surprised and disadvantaged petitioner.
This Court will not consider issues not properly pleaded. Markwardt v. Commissioner,64 T.C. 989, 997 (1975); Estate of Mandels v. Commissioner,64 T.C. 61, 73 (1975); Estate of Horvath v. Commissioner,59 T.C. 551, 556 (1973). The propriety of the pleadings depends on whether the Court and the parties have been given fair notice of the matters in controversy and the basis *546 of their respective positions. Rule 31(a), Tax Court Rules of Practice and Procedure. We must decide, therefore, whether petitioner was surprised and disadvantaged by respondent's reliance on the substance-over-form doctrine. Schuster's Express v. Commissioner,66 T.C. 588, 593 (1976), affd. 562 F.2d 39 (2d Cir. 1977); Markwardt v. Commissioner,supra.
Petitioner asserts that his first notice of respondent's substance-over-form theory was in respondent's opening brief. Petitioner contends that his evidence at trial would have been wholly different had he known that respondent was going to raise the substance-over-form doctrine. He specifically states that he would have: (1) submitted evidence indicating that the transferred securities were in fact re-registered in JPMC's name or, (2) refused to stipulate that the securities were sold on the same day that they were delivered to JPMC. We disagree that petitioner was surprised and disadvantaged by respondent's reliance on the substance-over-form doctrine. Further, we have expressly found that petitioner was notified of respondent's intentions to argue a substance-over-form *547 theory through his trial memorandum, served on petitioner prior to trial. [6]
Petitioner complains that respondent has abandoned the issue of whether the tax attributable to the sale of securities by JPMC is allocable to petitioner because he is no longer relying on section 482. We disagree. In Commissioner v. Transport Manufacturing and Equipment Co.,[7] the Eighth Circuit Court of Appeals addressed a similar issue where the respondent had not pleaded section 482 but had initially relied upon something analogous to an adequacy-of-consideration theory. In that case the respondent failed to notify petitioner that he intended to reply on section 482. The Court of Appeals affirmed the Tax Court's determination that respondent's failure to notify petitioner in his answer, or at trial of his intended theory for sustaining this deficiency, was inadequate and had surprised and disadvantaged petitioner. In resolving this procedural issue, the Court of Appeals noted, however, that: *548 * * * [I]f * * * a certain code section, theory or regulation has not been specifically raised in the notice of deficiency, * * * and if there is an absence of surprise on the taxpayer's part, the taxpayer has no reason to complain. [8]
We conclude that the notification given prior to trial to petitioner of respondent's reliance on the substance-over-form doctrine was sufficient to overcome any claim by petitioner that he was surprised or disadvantaged. Further, the evidence would not have been appreciably different had petitioner been expressly notified earlier of respondent's intent to raise the substance-over-form theory. Petitioner's failure to stipulate to dates concerning the transfer and sale of petitioner's personal stock would not have hindered us from making the same findings that we have made in this case. [9] Moreover, the evidence introduced at trial was germane and relevant to the substance-over-form *549 inquiry. The evidence submitted by respondent focused on the history of JPMC, the transfer of petitioner's securities to JPMC and their subsequent sale, JPMC's financial position, petitioner's advancement of personal funds, and JPMC's large carryover losses. Finally, the Court must decide whether respondent's reliance on this doctrine constitutes a new matter or issue which would shift the burden of proof to respondent. Rule 142(a) of the Tax Court Rules of Practice and Procedure.If the new theory either alters the original deficiency or necessitates the introduction of different evidence, it presents a "new matter". Achiro v. Commissioner,77 T.C. 881, 890 (1981); Tauber v. Commissioner,24 T.C. 179, 185 (1955). If, however, the new theory merely clarifies or develops respondent's original determination, there is no *550 new matter and the burden of proof is not shifted. Achiro v. Commissioner,supra;Estate of Sharf v. Commissioner,38 T.C. 15, 27-28 (1962). We hold that respondent's substance-over-form argument does not constitute a new matter since respondent's reliance on this doctrine does not increase the original deficiency nor require the introduction of different evidence. The only issue is, and has been, whether the capital gain realized on the sale of stock by JPMC on the day that Mr. Stewart contributed these stocks to the corporation is taxable to petitioner. Respondent's reliance on the substance-over-form theory of defense, rather than section 482, does not vitiate respondent's statutory notice nor shift the burden of proof to him. [10]
The substance-over-form doctrine *551 requires that, after viewing the steps of a transaction as a whole, the incidents of taxation falls on the true seller and not on a mere conduit through which title passes. Commissioner v. Court Holding Company,324 U.S. 331, 334 (1945). Whether a series of transfers constitutes one or more transactions for tax purposes is a question of fact. Commissioner v. Court Holding Company,supra at 332; United States v. Cumberland Public Service Co.,338 U.S. 451, 454 (1950). Although a taxpayer is entitled to minimize his tax liabilities by lawful means, the steps he takes to do so must have a valid business purpose, apart from tax-savings motives. Gregory v. Helvering,293 U.S. 465, 469 (1935). Therefore, it is for us to decide whether petitioner's contributions of securities to JPMC had a legitimate business purpose, of whether JPMC was merely the conduit through which petitioner sold his personal stock, hoping to avoid tax thereon. In making this determination, three earlier decisions of this Court are especially helpful. Of the three, the first two highlight the kind of evidence that would indicate that *552 the petitioner had used the Corporation as a conduit through which to pass title; while the last decision illuminates those facts and circumstances that would justify the contribution by a taxpayer of large amounts of stock to a closely held corporation. In Hallowell v. Commissioner,56 T.C. 600 (1971), we held that the taxpayer, and not the corporation that he controlled, was taxable on the sale of appreciated securities that he transferred to the corporation and which the corporation sold a short time later. In reaching this decision, the Court noted that the annual distributions made by the corporation to the taxpayer corresponded roughly with the amount of gain derived annually from the sale of donated stock. Hallowell v. Commissioner,supra at 607. We concluded, therefore, that the sale of these securities was made for the benefit of the taxpayer. As in the case before us, the corporation in this earlier decision had large net operating losses available for carry forward in the years of sale, and the proceeds from the sale were returned to the taxpayer in the form of repayments of loans. In an earlier but equally pertinent decision, *553 this Court held in Abbott v. Commissioner,T.C. Memo. 1964-65, affd. per curiam, 342 F.2d 997 (5th Cir. 1965), that the taxpayer, and not the company in which he had a 50 percent interest, was taxable on the sale of appreciated stock. Although this Court found that the proceeds from the sale were used in the company's operations, it stated that the reduction of corporate taxes resulting from the additional transfer of taxpayer's personal securities to one of the corporations he controlled, was not a sufficient business purpose to justify separate treatment for tax purposes of several transactions taken to arrive at an originally intended result. By contrast, the taxpayer in Smalley v. Commissioner,T.C. Memo. 1973-85, had sufficient business purpose for contributing appreciated stock to his closely-held corporation, even though the corporation subsequently sold the stock and utilized large net operating losses available for carryover in the year of the sale. This decision turned on the fact that most of the proceeds from the sales were used to repay bank loans, the repayment of which was a precondition to further business negotiations *554 with an unrelated company. In conclusion, it is important to note the facts and circumstances that distinguish Smalley from Hallowell or Abbott. First, unlike the taxpayer in Smalley, the petitioner in Hallowell realized personal gain as a consequence of the sale of the securities he had previously transferred to the corporation. Second, in Abbott, the petitioner was taxed on the sale of the appreciated stock because the questioned transaction had no legitimate business purpose other than the reduction of taxes. Finally, the petitioner in Smalley had both a strong business purpose and benefited personally only to the extent that the sale of these stocks was a prerequisite to continued business negotiations with an unrelated third party. In the case now before us, the factors cited by this Court in Smalley,supra, are noticeably absent. Petitioner contributed appreciated securities to JPMC which were sold by the corporation on the same day. Of the $ 268,270.40 net sales proceeds, JPMC distributed $ 64,500.00 or approximately 24 percent directly to petitioner or to a third party (Valley National Bank) for petitioner's benefit. *555 An additional $ 144,473.27 or approximately 53.86 percent went to either Consolidated, a sole proprietorship owned by petitioner, or to SPMC, a company in which petitioner held a 45 percent (and effectively controlling) interest. It is also revealing that JPMC distributed $ 74,835.41 to Consolidated when the record indicates that the sums advances to JPMC by Consolidated totaled only $ 6,041.97. Although petitioner claims that the transfer of the securities was intended to improve JPMC's financial position, we fail to see how the company's position was measurably improved in light of the fact that JPMC retained no more than $ 35,193.34, or 13 percent of the sale proceeds, and most, if not all, of the balance went either to petitioner, one of his many other businesses, or to Valley National Bank. [11] Furthermore, the record does not indicate that outside creditors or business associates, potential or actual, were demanding that JPMC strengthen its position as a prerequisite to any dealing. We conclude, therefore, that petitioner has not shown any valid business purpose, other than tax savings, for the formalistic *556 "transfer" of his stocks to JPMC in exchange for its shares; that JPMC was acting merely as a conduit for petitioner; and that petitioner was the true seller of the securities. Accordingly, petitioner and not JPMC is taxable on the capital gain. To give effect to the above, as well as the other issues herein which have been stipulated by the parties, Decision will be entered under Rule 155.
Footnotes
*. This case was tried before Judge Cynthia Holcomb Hall who subsequently resigned from the Court. By order of the Chief Judge dated February 1, 1982, the case was reassigned to Judge Jules G. Korner III↩. 1. All statutory references are to the Internal Revenue Code of 1954, in effect during the years in issue.↩
**. Petitioner Mary Jane Stewart is involved herein only because of signing a joint return with Spencer D. Stewart for the years in issue.↩
2. While the Agreement provided for certain amounts to be transferred to petitioner at the time of the Agreement, the exact amount of the award would not be known until a final judgment was rendered in the condemnation proceedings.↩
3. This amount was incorrectly stated as $ 239,137.04 in respondent's deficiency notice.↩
4. The figures on the exhibit showing the disposition of these proceeds do not add up to the total net sales proceeds. This discrepancy is unexplained. ↩
5. At this time, petitioner's secretary and his accountant each owned five percent interests and F.T. Thum, petitioner's business associate, owned a 45 percent interest.↩
6. Respondent contends that petitioner was notified of his intentions to rely on the substance-over-form doctrine at a pre-trial conference held in June of 1979, but this is not in the record.↩
7. Commissioner v. Transport Manufacturing and Equipment Co.,478 F.2d 731, 734↩ (8th Cir. 1973).
8. 478 F.2d at 735, n. 8. See also: Mills v. Commissioner,399 F.2d 744, 748↩ (4th Cir. 1968), affg. Memorandum Opinion of this Court.
9. At the trial Mr. Munson, petitioner's accountant, initially testified that the dates differed. After reviewing the journal entries which he himself made, he stated that the sale dates corresponded to the contribution dates.↩
10. Indeed, the two theories overlap considerably, since section 482 is aimed at situations where commonly-controlled taxpayers may have their income distorted by unreal, artificial or non-arms-length arrangements. See sec. 1.482-1(b), Income Tax Regs.↩
11. The record does not show that JPMC owned any money the VNB.↩