JOHN L. TOUCHETT AND JOSEPHINE A. TOUCHETT, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Touchett v. Commissioner
Docket No. 4077-80.
United States Tax Court
T.C. Memo 1982-285; 1982 Tax Ct. Memo LEXIS 459; 43 T.C.M. (CCH) 1462; T.C.M. (RIA) 82285; May 24, 1982. F. Patrick Matthews, for the petitioners. Mark D. Petersen, for the respondent. KORNER
MEMORANDUM FINDINGS OF FACT AND OPINION KORNER, Judge:* Respondent determined a deficiency in petitioners' Federal income tax for the calendar year 1973 in the amount of $ 3,851.63. The only adjustment by respondent to petitioners' income which was appealed to this Court by petitioners, and therefore the only issue which has to be determined in this case, is whether petitioners realized taxable income, in the form of long-term capital gains, in the year 1973 as the result of the *460 sale of certain stock by petitioner John L. Touchett in that year. The evidence in the case consists of a stipulation of facts with attached joint exhibits, together with testimony and another exhibit received at trial. In addition, the parties have stipulated that the record evidence presented in the case of Lorraine T. Fink, Petitioner v. Commissioner of Internal Revenue, Respondent, Docket No. 4042-80, may also be considered as part of the record herein. FINDINGS OF FACT Petitioners John L. Touchett and Josephine A. Touchett, husband and wife, were residents of Delavan, Wisconsin, at the time the petition herein was filed. Petitioners timely filed a joint Federal income tax return for the calendar year 1973 and a subsequent amended return for said year with the Internal Revenue Service Center at Kansas City, Missouri. [1]
*461 E-Z Paintr Corporation ("Paintr") was a Delaware Corporation, with its principal place of business at Milwaukee, Wisconsin. Its principal business was the making of paint rollers and closely related products. On November 18, 1972, at a time when petitioner owned 13,842 shares of the common stock of Paintr, he entered into a contract with an unrelated business corporation named Newell Companies, Inc. ("Newell"). This agreement provided for the immediate purchase of 1,000 shares of petitioner's Paintr stock by Newell, at a price of $ 15 per share. The agreement further granted to Newell an option to purchase the remaining Paintr shares owned by petitioner at a price of $ 15 per share. The agreement also provided that Newell had to exercise its option within six months of the date of the agreement, in the event that it had acquired 51% control of the outstanding common stock of Paintr in the meantime. Upon exercise of this option, petitioner was entitled to be paid in cash unless, prior to January 1, 1973 he gave written notice to the company that he elected to take a promissory note in lieu of cash, such note to bear interest at the rate of 6 1/2% per annum, due 10 years following *462 its making. Under date of December 29, 1972, the above option agreement between petitioner and Newell was amended. So far as pertinent herein, these amendments included a recital that petitioner's shares subject to the option agreement were 12,842, and that petitioner's option to take a promissory note from Newell for the shares, in the event of Newell's exercise of the option, was cancelled. On March 14, 1973, the option agreement between petitioner and Newell was further amended so as to extend the option period until 20 days following the next annual meeting of stockholders of Paintr or until January 15, 1974, whichever date should first occur. In consideration of this extension of time, it was agreed that petitioner would be entitled to tender 10,342 shares of his Paintr stock to Newell for purchase pursuant to the terms of a public offer made by Newell dated February 8, 1973, at a price of $ 15 per share. Two days later, on March 16, 1973, petitioner tendered these shares to Newell, and was paid $ 155,130.00 for them. After this transaction, petitioner continued to own 2,500 shares of Paintr stock which was still subject to the Newell option to purchase. Petitioner *463 in the summer of 1973 found himself in financial difficulties. He was liable for $ 714,700.00 for loans made either directly to him or guaranteed by him from the Merchants and Savings Bank of Janesville, Wisconsin ("M&S Bank"), not including accrued interest. Said loans were secured, in large part, by Paintr stock belonging to petitioner's mother Lorraine T. Fink, which she had allowed to be pledged as collateral for petitioner's loans at the M&S Bank, as well as by petitioner's own Paintr stock. As of August 14, 1973, there were 33,509 shares of petitioner's mother's stock so pledged at the M&S Bank on account of petitioner's debts and guarantees, as well as the remaining 2,500 shares belonging to petitioner. In addition, petitioner had mortgage loans from the M&S Bank in excess of $ 200,000.00, and was also indebted to another bank for loans of $ 97,000.00. In the summer of 1973, the M&S Bank had been criticized by the banking authorities, who considered that petitioner's loans with the bank were of unacceptable quality. The bank, in turn, began to press petitioner for payment or substantial reduction of his outstanding loans. Under the terms of the collateral agreements, *464 covering the Paintr stock of petitioner and his mother, which had been posted as collateral with the M&S Bank for petitioner's loans and guarantees, the bank was entitled to take and liquidate for the best price obtainable these collateralized shares at any time when the bank, within its sole, good faith discretion, considered itself to be "insecure" with respect to the loans; and petitioner had been warned by an executive of the M&S Bank that if his loans were not paid within a reasonable time, the bank would liquidate the collateral which it held, consisting principally of petitioner's shares and his mother's shares. On August 14, 1973, at a time when Paintr stock was trading publicly in a range of 6 1/4 bid to 7 1/4 asked, petitioner and his attorney went to Chicago to confer with Newell's attorneys, in an attempt to secure the immediate sale to Newell of petitioner's remaining 2,500 shares of stock, together with 48,772 shares which petitioner had previously bought from his mother at the option price of $ 15 per share. (Said 48,772 shares included 33,509 shares still under pledge to the M&S Bank.) Petitioner and his attorney took with them the certificates representing these *465 shares of stock (the shares still under pledge to the M&S Bank having temporarily been released to the custody of Touchett's attorney for this purpose). Newell declined at that time to exercise its option and pay all cash; it did agree, however, as memorialized in an agreement dated August 27, 1973, that its option with respect to the 48,772 shares which petitioner had purchased from his mother, as well as the 2,500 shares already owned by petitioner, would be considered as exercised as of August 14, 1973, with payment for the shares, at $ 15 per share, to be made prior to January 1, 1974. Under the terms of the amendments to the options (as Newell then understood its obligation), Newell had no obligation, prior to this agreement, to exercise the options which it held prior to January 15, 1974. Part of the agreement of August 27, 1973 provided that Newell would pay interest "at the prime rate charged from time to time by the Northern Trust Company of Chicago", from August 14, 1973, to the date of payment for the shares. On December 26, 1973, Newell carried out the agreement of August 27, 1973, by paying petitioner $ 731,580.00 by check in payment for 48,772 shares of Paintr. *466 With respect to the additional 2,500 shares of Paintr, Newell asked petitioner to take its promissory note instead of cash in payment for these shares. At the time of purchase of petitioner's stock by Newell, petitioner was an employee of Newell serving at its pleasure. Petitioner felt obligated to take the promissory note rather than cash to insure his position with the company. Accordingly, on December 26, 1973, Newell executed and delivered its promissory note payable to petitioner in the amount of $ 37,500.00 and received the 2,500 Paintr shares. The promissory note was fully negotiable and recited that it was due "on demand after date"; it further provided, however, that "if any payment is not made when due, or if holder deems itself insecure, the unpaid balance shall, at the option of the holder, and without notice, mature and become immediately payable." The promissory note provided that interest be paid "at the prime rate charged from time to time by Northern Trust Company of Chicago." The prime rate charged by Northern Trust Company of Chicago at the time the note was entered into was approximately 10%. At the time of Newell's purchase of petitioner's shares on December 26, 1973, Newell *467 had large loans outstanding against it. The money which it paid petitioner for his stock was borrowed money, at least in part. Its cash position at that time was poor. Although the note which Newell gave to petitioner on December 26, 1973, stated on its face that it was payable on demand, petitioner and Newell entered into an informal oral agreement or understanding that petitioner would not demand payment of the note prior to January 31, 1974. Such understanding was confirmed by an audit confirmation statement sent to petitioner by Newell on February 28, 1974, which recited that the due date of the note was January 31, 1974, and which petitioner signed and returned as being correct. The promissory note issued by Newell to petitioner was paid to him on December 27, 1974. Petitioner reported the gain on the sale of his 2,500 shares of Paintr stock on his 1974 income tax return. [2] Upon audit of petitioner's 1973 income tax return, respondent determined that petitioner had received payment in the amount of $ 37,500.00 in 1973 from the sale of his 2,500 shares of Paintr stock to Newell, upon which petitioner realized a gain of $ 32,875.00, which was long-term capital gain, and *468 which was taxable in 1973. OPINION There is no disagreement between the parties that the Paintr stock in petitioner's hands constituted a capital asset, nor is there any disagreement between the parties as to petitioner's cost basis, nor as to his right to compute his taxable gain as long-term capital gain under the provisions of sections 1201 and 1202 of the Internal Revenue Code. [3] The only issue between the parties is as to the amount of consideration, if any, which petitioner received in the year 1973 as the proceeds of sale of 2,500 shares of his Paintr stock, for which he received payment in the form of a promissory note, rather than cash. [4]
*469 Petitioner claims that he was not required to report any gain from the sale of his 2,500 shares of Paintr stock in 1973 because the Newell promissory note for $ 37,500 which he received in that year had no ascertainable market value, and that he presented convincing evidence to this effect. Respondent, on the other hand, contends that the negotiable promissory note received by petitioner in 1973 should be considered as worth its full face value, unless a contrary showing is made; that the burden was on petitioner to show that this note was worth less than its face value for some reason; and that petitioner has failed to carry his burden of proof in this regard. We agree with respondent that petitioner had the burden of proof to show that the note was worth something less than its face value. Welch v. Helvering,290 U.S. 111 (1933); Tax Court Rules of Practice and Procedure, Rule 142(a). [5]
The section of the Code which is critical herein is section 1001(b), which, in relevant part, provides: (b) Amount Realized. - The amount realized from the sale or other disposition *470 of property shall be the sum of any money received plus the fair market value of the property (other than money) received. * * * Pursuant to this Code provision, it is well established that a taxpayer must include in income, for the year of receipt, the fair market value of a negotiable promissory note of a responsible and solvent maker. Kingsbury v. Commissioner,65 T.C. 1068, 1091 (1976); Williams v. Commissioner,28 T.C. 1000 (1957); Barnsley v. Commissioner,31 T.C. 1260 (1959). That a negotiable promissory note is "other property" within the meaning of section 1001(b) cannot be doubted. Estate of Webb v. Commissioner,30 T.C. 1202 (1958). Petitioner attempted to show that Newell, at December 26, 1973, was in such bad financial condition that its fully negotiable promissory note had no ascertainable fair market value. He attempted to establish this proposition through the testimony of two witnesses, one of whom was vice president for finance of Newell, and the other of whom was a senior officer of the M&S Bank.
The official of Newell testified in rather general terms that at the end of 1973 Newell was highly *471 extended with regards to loans, and was in such a tight cash position that it would have been difficult for it to pay petitioner $ 37,500 in cash for his Paintr shares. The witness further testified, however, that he felt that Newell would have been able to borrow more money if necessary. In view of the fact that Newell had paid petitioner $ 155,130 on March 16, 1973, for some of his Paintr shares, and, more importantly, had paid petitioner $ 731,580 on December 26, 1973, for other Paintr shares (the same day the promissory note was issued), we find it difficult to believe that Newell could not have raised another $ 37,500 to pay petitioner for his final block of 2,500 shares on that day. The witness further testified that at the time of the issuance of the promissory note to petitioner, Newell's liabilities did not exceed its assets. We think that there is insufficient evidence in this record to establish that Newell's promissory note to petitioner was worth less than its face value, based on Newell's allegedly bad financial condition. Petitioner also offered the testimony of a senior official of the M&S Bank, who testified that his bank would not hav purchased the Newell note *472 at that time, because of the established policy of his bank. He testified that he did not know whether any other banking or lending institution would have bought or discounted the note at that time.The testimony of this witness, which was clearly confined to what his own bank would have done, and not as to what other banks would have done (a matter as to which he testified he had no knowledge), is not sufficient. The fact that notes would not be bought or taken as collateral for loans by banks is not determinative of a note's fair market value. Wray-Dickinson Co., Inc. v. Commissioner,6 B.T.A. 269 (1927); Burman v. Commissioner,23 B.T.A. 639 (1931). Additionally, we note that Newell paid off this note to petitioner in full a year after its issuance, on December 27, 1974. At trial, as well as on brief, petitioner attempted to show, over respondent's vigorous objections, that the promissory note in question herein, which on its face purported to be a demand note, was not intended by the parties to be a demand note but rather a term note, which would have a negative effect on its market value. Petitioner presented both his own testimony as well *473 as the testimony of the Newell official executing the promissory note, that it had been agreed that petitioner would not demand immediate payment of the note, but would wait until 1974 to collect it, and that the fact that the note was stated to be payable on demand on its face was the result of a mutual mistake of fact, which would permit the petitioner to fit within a recognized exception to the parol evidence rule and thus permit him to vary the terms of the promissory note. We find it unnecessary to rule on this question directly. Even assuming (without deciding) that petitioner should be permitted to show, as his evidence suggests, that he and Newell made an oral agreement, either at the time of the signing of the note or immediately subsequent thereto, that petitioner would not demand immediate payment, we think that the most that petitioner's evidence shows is that there may have been an agreement that demand for payment would be deferred only for about a month, until January 31, 1974, as shown in the audit confirmation notice with respect to this note which Newell issued to petitioner and which petitioner signed and returned as being correct. We are not prepared to hold in *474 this case that an agreement by the parties for a one month extension of time in demanding payment would have any measurable impact on the fair market value of the fully negotiable note. As a result, we must hold that petitioner has failed to carry his burden of proof to show that the Newell note, concededly received by him in 1973, was worth less than its face amount of $ 37,500. We accordingly hold for respondent. Decision will be entered for respondent.
Footnotes
*. This case was tried before Judge Sheldon V. Ekman, who died before deciding the case. By order of the Chief Judge dated March 19, 1982, this case was reassigned to Judge Jules G. Korner III↩ for disposition.
1. Josephine A. Touchett is a party to this action only by virtue of her filing a joint Federal income tax return with petitioner John L. Touchett. All reference hereinafter to "petitioner" refers solely to petitioner John L. Touchett.↩
2. This last sentence is not established by the written stipulation of the parties herein, nor any other exhibit or evidence in the case. However, it was requested as a finding of fact by petitioner, and respondent specifically noted no objection; we therefore treat it as an additional stipulated fact.↩
3. All statutory references herein are to the Internal Revenue Code of 1954, as it existed in the year before the Court, unless otherwise stated. ↩
4. At the outset, the following should be noted: in his statutory notice of deficiency herein, respondent determined that petitioner had constructively received $ 37,500 in 1973 in payment for his 2,500 Paintr shares. In his trial memorandum and his opening statement, however, respondent announced that, in addition to the theory of constructive receipt, respondent would rely also on the theory that petitioner had received payment for his stock in the year 1973 in the form of a negotiable promissory note, which was to be considered as worth its face value, unless petitioner could establish that the note had no value or was worth less than its face amount. On brief, respondent has abandoned the constructive receipt theory altogether, and is relying solely on his second theory -- that petitioner has failed to show that the note received by petitioner was worth anything other than its face value. At first blush, therefore, we might be faced with deciding the troublesome and oft-disputed question whether respondent's second theory or position, upon which he now solely relies, (a) should have bee specifically pleaded by respondent in an amended answer, (b) raises a new matter which would require respondent to assume the burden of proof, and/or (c) is prejudicial to petitioner in that he had no fair and reasonable notice of such new issue, so as to be able to prepare for it and present appropriate evidence with respect to it. Any such situation might justify the Court in ruling that the respondent must assume the burden of proof as to the new matter, or might even justify the Court in refusing to consider the new matter altogether. Achiro v. Commissioner,77 T.C. 881 (1981). On the other hand, the assertion of a new theory which merely clarifies or develops the original determination without being inconsistent or increasing the amount of deficiency is not a new matter requiring the shifting of the burden of proof. Achiro v. Commissioner,supra, and cases therein cited. Likewise, if a specific Code section, theory or regulation was not specifically raised in the notice of deficiency but there is no element of surprise to petitioner or disadvantage to him resulting from respondent raising such new theory (such as being unprepared to offer appropriate evidence to combat the new theory), then petitioner has no reason to complaint about it and the burden of proof will remain upon petitioner as before. Commissioner v. Transport Manufacturing Equipment Co.,478 F.2d 731 (8th Cir. 1973); Nat Harrison Associates, Inc. v. Commissioner,42 T.C. 601↩ (1964).Where the question is properly raised by a party in a given case, the resolution of it can frequently be a difficult matter. In the instant case, however, we are not called upon to resolve the question. Petitioner did not raise it, either at trial or on brief, and it must therefore be considered that he has waived the point. In addition, we note that it is clear from the record that petitioner was not surprised by respondent's new theory. He clearly knew that the issue of the fair market value of Newell's note was before the Court, and he presented testimony of three witnesses (including himself) on that subject. We therefore have no occasion to grasp the nettle in this case.
5. See our discussion of the question of burden of proof in footnote 4, supra.↩