COMMISSIONER OF INTERNAL REV-
ENUE, Appellant,

v.

TRANSPORT MANUFACTURING AND
EQUIPMENT COMPANY, Appellee.

TRANSPORT MANUFACTURING AND
EQUIPMENT COMPANY, Cross-
Appellant,

v.

COMMISSIONER OF INTERNAL REV-
ENUE, Cross-Appellee.

Nos. 72–1321, 72–1493.

United States Court of Appeals,
Eighth Circuit.

Submitted Feb. 12, 1973.

Decided April 20, 1973.

**732**

James K. Logan, Olathe, Kan., and Guy A. Magruder, Kansas City, Mo., for Transport Mfg. Co.

Michael L. Paup, Atty., Tax Div., Dept. of Justice, Washington, D. C., for Commissioner.

Before GIBSON and ROSS, Circuit Judges, and BENSON,* District Judge.

GIBSON, Circuit Judge.

Both the Commissioner and taxpayer, Transport Manufacturing & Equipment Company (T.M.E.), appeal from adverse holdings rendered on two different issues by the Honorable Leo H. Irwin, United States Tax Court.[1] This Court has jurisdiction pursuant to 26 U.S.C. § 7482(a) to review Tax Court decisions "in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury." We affirm the Tax Court on both issues.

Two questions are presented in this appeal: (1) Did the taxpayer realize a capital gain on the sale of certain equipment in 1957? and (2) Was the Tax Court correct in holding that the taxpayer was not entitled to a net operating loss carryback for a bad debt deduction allegedly occurring in 1960? These questions will be discussed seriatim.

## TAXPAYER'S 1957 SALE OF TRAILERS

A. *Factual Discussion.* T.M.E., owned and controlled by the Riss family, leased non-refrigerated and refrigerated vans and tank trailers to Riss & Co., Inc. (Riss & Co.), an interstate motor carrier also founded and controlled by Richard Riss, Sr. Riss & Co., subject to the rules and regulations of the Interstate Commerce Commission, founded T.M.E. to avoid an ICC regulation re-

---

* Chief Judge of the United States District Court for the District of North Dakota, sitting by designation.

1. The Tax Court opinions are published. Riss v. Comm'r, 56 T.C. 388 (1971); Riss v. Comm'r, 57 T.C. 469 (1971) (supplemental opinion).

quiring a hearing whenever a carrier with more than $500,000 in debt sought to incur further indebtedness.[2] T.M.E. was organized as an independent corporation to buy the carrier's (Riss & Co.'s) equipment and to lease that equipment to the carrier on a "net lease" basis. Riss & Co. paid T.M.E. a monthly rental on each item of equipment, which was determined by a depreciation method employed by T.M.E., plus a monthly charge to cover T.M.E.'s overhead and interest expense. At the end of the leasehold agreement, Riss & Co. was usually given the option of purchasing the rental equipment at the original book value less the accumulated depreciation. The Tax Court said that "T.M.E. was designed merely to serve as a conduit for equipment needed for Riss" and "it was never intended that T.M.E. would reap a profit of any significance from its dealings with Riss." [3]

In 1954, T.M.E. purchased 1,216 vans and trailers from Fruehauf Trailer Co. for $8,471,294. By leasehold agreements dated April 1, 1954, T.M.E. leased all of this equipment to Riss & Co. for a six-year term. T.M.E. assigned the leases to Fruehauf as additional security for the purchase mortgage executed to Fruehauf on the purchase of the trailers and vans. Of the 1,216 trailers and vans, 899 were designed experimentally with aluminum components replacing the traditional steel sections. During three years of use by Riss & Co., the trailers required extensive repairs. Riss & Co. estimated that these repairs due to the faulty design and the lost time of the use of the equipment cost it between $700,000 and $800,000.

By agreements dated January 16 and July 16, 1957, Fruehauf contracted to repurchase 814 of the 1,216 trailers and vans sold to T.M.E. in 1954. The agreed repurchase price was $3,904,000. T.M.E. also purchased 850 improved trailers and vans from Fruehauf to be used in

Riss & Co.'s expanding frozen food shipping. From 1954 until the time of the sale in 1957, T.M.E. had depreciated the 814 trailers in the amount of $3,683,756.43, which left a date-of-sale basis (book value) in the trailers sold of $1,688,756.47. The difference between the amount received from Fruehauf ($3,904,000) and the taxpayer's basis ($1,688,756.47) was $2,215,243.53. T.M.E. credited this amount to a receivable account marked "A/C Rec. Riss & Co.," on the basis of the following agreement entered into by Riss & Co. and T.M.E. on January 16, 1957:

"AGREEMENT

"WHEREAS, Transport Manufacturing & Equipment Co. owns and has under long term lease to Riss & Company, Inc. certain 1954 Fruehauf semi-trailers, which leases will expire on various dates following January, 1960.

"WHEREAS, Transport Manufacturing & Equipment Co. now has an offer to purchase certain of these units which would require that Riss & Company, Inc. agree to cancel the existing leases on the units sold, and

"WHEREAS, the existing leases on these units are on a declining rental basis calling for higher rentals in the early years and lower rentals in the later years, and the cancellation of the leases would result in a sacrifice by Riss & Company, Inc. of the low rentals during the last months of the aforementioned leases.

"NOW THEREFORE BE IT UNDERSTOOD, that Riss & Company, Inc. does hereby agree to the cancellation of the leases on the units which Transport Manufacturing & Equipment Co. desires to sell and that in consideration for the agreement by Riss & Company, Inc., to cancel the leases on the units sold that Transport

2. We are told by the parties that this was an "industry wide practice."

3. Riss v. Comm'r, 56 T.C. 388, 393 (1971). A more complete factual discussion can be found in that opinion at 56 T.C. 388, 392–397 (1971).

Manufacturing & Equipment Co. does hereby agree to pay Riss & Company, Inc. an amount equal to the sale price above Transport Manufacturing & Equipment Co.'s book value on the sale of these units."

The above agreement had the effect of transferring the entire profit on the repurchase sale from T.M.E. to Riss & Co. The Tax Court stated that the price for the used trailers "was above market" and appeared to compensate Riss & Co. for the damages suffered due to the defectively designed trailers. 56 T.C. 388, 397 (1971). The Tax Court also noted that Riss & Co. had been experiencing steady losses in revenue at this same time. 56 T.C. 388, 397 (1971). Obviously, it was to T.M.E.'s benefit to pass the gain on the sale of the trailers through to Riss & Co., which was experiencing heavy losses.

The Commissioner sent T.M.E. a notice of deficiency, which assessed, as capital gain, the excess of the amount received by the taxpayer from Fruehauf over T.M.E.'s basis. The notice of deficiency did not inform the taxpayer, in any manner, of the reason for the deficiency.

The Tax Court, in its first opinion, held that the Commissioner failed to apprise the taxpayer of his intent to employ 26 U.S.C. § 482's[4] "arm's-length" theory to sustain the deficiency, and, therefore, the issue was raised too late to be considered by the Tax Court. 56 T.C. 388, 401 (1971). However, the Tax Court went on "to examine the financial consequences" of the lease cancellation agreement and under an "adequacy of consideration" theory found that $217,413.03 of the $2,215,243.53 gain remained with T.M.E. 56 T.C. 388, 405

(1971). However, in a supplemental opinion, the Tax Court upon reconsideration held that this assessment of $217,413.03 was actually based on an "adequacy of consideration" theory (also derived from § 482), which was also presented by brief after trial and too late to be considered by the Tax Court. 57 T.C. 469, 472 (1971). The Tax Court, therefore, finally held that T.M. E. had not realized any gain on the sale of the trailers, because the Commissioner failed to inform the taxpayer T.M.E. "either in the statutory notice, in his answer, or at trial of his intended theory for sustaining the deficiency." 57 T.C. 469, 474 (1971).

■ B. *Legal Discussion.* In reviewing Tax Court decisions, we apply the clearly erroneous standard. Findings supported by substantial evidence on the record as a whole which are not against the clear weight of evidence or induced by an erroneous view of the law will not be disturbed on appeal. Wilmington Co. v. Helvering, 316 U.S. 164, 62 S.Ct. 984, 86 L.Ed. 1193 (1942); C. I.R. v. Riss, 374 F.2d 161, 166 (8th Cir. 1967); Lessmann v. C.I.R., 327 F.2d 990, 993–994 (8th Cir. 1964); Schoenberg v. C.I.R., 302 F.2d 416, 419 (8th Cir. 1962).

It is uncontested that the notice of deficiency, Commissioner's answer, and trial statements and testimony did not expressly refer to § 482 and the theories based on that section to sustain the Commissioner's assessment. The Commissioner, however, argues that the taxpayer was sufficiently apprised of the intended use of § 482, because the pleadings and evidence introduced at trial "centered around the economic basis for the cancellation payment" and, there-

---

4. That section reads:
  "482, Allocation of Income and Deductions Among Taxpayers
    "In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary or his delegate may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses."

fore, inferentially indicated that the taxpayer knew of the Commissioner's intended use of § 482's arm's-length and adequacy of consideration theories. The Commissioner cites many instances concerning statements made in pleadings by both parties and at trial "pertaining to the economic realities of the lease cancellation payment—[e. g.] . . . whether, in fact, Riss so badly wanted new equipment that it would have voluntarily relinquished its rights under the lease."

The Tax Court held on these arguments that:

". . . the issue framed by the pleadings and presented at trial was whether T.M.E. realized the gain at all and was not whether T.M.E., after having realized the gain, could deflect part of it to Riss as compensation for loss of an advantageous lease." 57 T. C. 469, 473 (1971).

In the first place, the questions of whether T.M.E. realized a gain or whether T.M.E. deflected a gain after realizing it are closely related and would involve use of much of the same evidence. We see this case as an attempt on T.M.E.'s part to present in its pleadings and prove at trial the validity of the lease cancellation agreement. On the other hand, the Commissioner, in order to sustain the deficiency, was attempting to prove the invalidity of the same agreement. Of course, in attempting to prove this invalidity, the Commissioner, at the time of the trial, could well have been inferentially suggesting that the agreement was not at arm's length or that there was a lack of adequate consideration. In effect, the Commissioner is asking that this Court hold that statements in pleadings and at trial

and evidence that may be taken to prove different theories should be sufficient to notify the taxpayer of the theory on which the Commissioner is relying although not explicitly telling the taxpayer the precise basis for the assessment. The real issue in this case is whether the taxayer should inferentially have to determine[5] the Commissioner's theories, or whether the Commissioner has a duty to specifically inform the taxpayer of those theories.

If a violation of a particular Internal Revenue Code section, Treasury regulation, or theory based on sections or regulations is involved, the Commissioner should notify the taxpayer of that section, regulation or theory. The failure to advise the taxpayer of such information is extremely prejudicial. Deficiency assessments are usually presumptively correct, and the taxpayer has the burden to prove them wrong.[6] The taxpayer works at an extreme disadvantage in trying to invalidate deficiency assessments if he does not specifically know why the Commissioner is challenging the taxpayer.[7] If the notice of deficiency does not state the reason for the deficiency, the Commissioner should then inform the taxpayer of the Code sections and theories in his answer. That is precisely the reason for the explicit provisions of Rule 14(b) of the Tax Court, which states:

"(b) *Form of answer.* The answer shall be drawn so that it will advise the petitioner and the Court *fully* of the nature of the defense." (emphasis added).

Fully advising the taxpayer includes recitation of the Code sections and theories on which the Commissioner relies.[8]

---

5. "Guess" could be appropriate in some situations.

6. Welch v. Helvering, 290 U.S. 111, 115, 54 S.Ct. 8, 78 L.Ed. 212 (1933); C.I.R. v. Riss, 374 F.2d at 166.

7. In Commissioner v. Chelsea Products, 197 F.2d 620, 624 (3d Cir. 1952), the court said that "[t]he Taxpayer can hardly shoulder its burden if it does not know . . . which transactions or group of transactions the Commissioner has deter-

mined to have resulted in distortions of true net income."

8. Of course, if a certain Code section, regulation or theory has not been specifically raised in the notice of deficiency, in the pleadings, or at trial and if there is an absence of surprise on the taxpayer's part, the taxpayer has no reason to complain. Nat Harrison Associates, Inc., 42 T.C. 601, 617 (1964).

■ Although the most appropriate times to advise the taxpayer of the Commissioner's theories to sustain an assessment would be first in the notice of deficiency and then in the Commissioner's answer, we do not hold that the Commissioner necessarily loses his right to pursue a theory or Code section that is not specifically raised before or at trial. The basic consideration is whether the taxpayer is surprised and disadvantaged when the Commissioner has failed to plead § 482. Commissioner v. Chelsea Products, *supra* at 197 F.2d 624; Nat Harrison Associates, Inc., *supra* 42 T.C. at 617; Burrell Groves, Inc. 16 T.C. 1163, 1169 (1951). However, the longer the Commissioner delays in not expressly advising the taxpayer of the intended theories, the more reason there is to conclude that the taxpayer has not received fair notice and has been substantially prejudiced so as to deny the Commissioner consideration of theories raised for the first time in post trial briefs. The Commissioner may avoid this uncertainty and discharge his duty of informing the taxpayer by expressly notifying the taxpayer of the intended theories in the deficiency notice and the Commissioner's answer.

■ We, therefore, hold in this case, that the T.M.E. should not be required to read between the lines of the pleadings, trial statements, or evidence to ascertain that any theory based on § 482 was intended by the Commissioner to sustain the deficiency assessment. In addition, the Tax Court had already made a general finding that the agreement between T.M.E. and Riss & Co. was based on "sound business judgment. and precipitated by factors beyond the control of either contracting party." 57 T.C. 469, 472 (1971). Since the Commissioner raised the arm's length and adequacy of consideration theories under § 482 for the first time in briefs after trial, the Tax Court did not have to consider these theories. J. William Frentz, 44 T.C. 485, 490–491 (1965), aff'd 375 F. 2d 662 (6th Cir. 1967). The finding by the Tax Court that the taxpayer was not apprised of the intended use of § 482's theories was supported by substantial evidence on the record and was not induced by an erroneous view of the law, We, therefore, affirm on this issue.

## TAXPAYER'S 1960 BAD DEBT DEDUCTION

Hampered by extreme financial difficulties, Riss & Co. by the end of 1960 owed T.M.E. $1,383,029.71 largely for the rental of equipment from T.M.E. In 1962, T.M.E. filed an amended return for 1960 and claimed that the $1,383,029.71 should be considered as a bad debt deduction in 1960 and that T. M.E. should be entitled to a net operating loss carryback. The Commissioner disallowed the deduction and T.M.E. filed a petition in Tax Court on September 24, 1962. The Tax Court also disallowed the deduction and said that "we are unable to say that, as of December 31, 1960, Riss' economic prospects were so moribund as to render worthless its obligations to T.M.E." 56 T.C. 388, 410 (1971).

The disallowance of this bad debt deduction presents nearly the identical issue that we faced in the companion case of Richard R. Riss, Sr. v. Commissioner, 478 F.2d 1160 (8th Cir. 1973). In that case, Richard Riss, Sr., who as a guarantor paid off a loan of Riss & Co. to Commercial National Bank of Kansas City, Kansas, was not allowed a bad debt deduction on his personal tax return in 1963. In both cases, the bad debt deduction depends on Riss & Co.'s financial capability to pay off its debts. Although this case involves Riss & Co.'s financial situation in 1960 while the companion case concerned the 1963 financial picture, we think that the company was clearly insolvent in both years and the chances of collecting either debt was at the best minimal. Although the Tax Court stated that prospects for collection of the debt were dim and that Riss & Co.'s debts exceeded its assets by a ratio of two to one, it held that the debt was not wholly worthless in 1960. The existence of Riss & Co.'s valuable trucking

routes, the continued operation of Riss & Co. as a going concern, and the extension of credit by T.M.E. to Riss & Co. in 1961 led the Tax Court to conclude that Riss & Co.'s obligation to T.M.E. was not "irreparably worthless" in 1960. 56 T.C. 388, 408–410 (1971). We are not inclined to disturb the Tax Court's factual findings to which it applied correct principles of law. Further, our discussion in the companion case on this issue applies with equal force to this case and need not be repeated. In addition, the taxpayer did not decide until 1962 that the Riss & Co. debt was worthless in 1960. An after-the-fact analysis does not aid the taxpayer in attempting to prove that a debt was wholly worthless in a prior year.

For the reasons stated here and in the companion case, we conclude that there is substantial evidence on the record as a whole to support the Tax Court's finding that the Riss & Co. debt to the taxpayer was not wholly worthless in 1960. Therefore, the taxpayer is not entitled to a net operating loss carryback.

We affirm the Tax Court.