Spencer D. STEWART, et ux., Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 82–7497.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 11, 1983.

Decided Sept. 2, 1983.

James Powers, Fennemore, Craig, von Ammon, Udall & Powers, Phoenix, Ariz., for petitioners.

Elaine F. Ferris, Washington, D.C., for respondent.

Before STEWART [*], Justice (Retired), DUNIWAY, Senior Circuit Judge, and ALARCON, Circuit Judge.

STEWART, Justice (Retired):

The Commissioner determined that the petitioners, Spencer D. and Mary Jane Stewart (referred to hereinafter as Stewart or the taxpayer [1]), owed federal income taxes in the amounts of $210,751.13 for 1966 and $45,444.21 for 1967. On the taxpayer's petition for review, the Tax Court [2] ruled: 1) that interest paid to Stewart by the City of Phoenix, Arizona (the City), pursuant to an agreement under which the City acquired immediate possession of Stewart's water utility for a price to be determined in condemnation proceedings was not exempt from taxation under I.R.C. § 103(a); and 2) that capital gain resulting from the sale of securities contributed by Stewart to a corporation controlled by him should properly be attributed to him. 43 T.C.M. (CCH) 1119 (1982).

I

A

In 1943 or 1944, the taxpayer became the sole owner of the Consolidated Water Company (Consolidated), an unincorporated business which owned and operated utilities that supplied water to households then outside the boundaries of the City of Phoenix. During the 1950's, the City grew rapidly and annexed some of its environs, including parcels in which Consolidated operated the water utility.

Under Arizona law, a city may not build, acquire, or lease a utility plant in an area already served by a public utility until it has purchased the utility for "the fair valuation thereof." Ariz.Rev.Stat.Ann. § 9–515 (1977) [3]. This sum may be determined in

---

[*] Honorable Potter Stewart, Associate Justice (Retired), United States Supreme Court, sitting by designation.

1. Mary Jane Stewart is joined as an appellant only because she signed joint tax returns for the years in question.

2. Judge Hall, who heard the evidence in this case, resigned from the Tax Court shortly after the trial. The case was thereafter assigned to Judge Korner, who issued the decision now before us.

3. Ariz.Rev.Stat.Ann. § 9–515 (1977) provides in relevant part:

A. When a municipal corporation and the residents thereof are being served under an existing franchise by a public utility, the municipal corporation, before constructing, purchasing, acquiring or leasing, in whole or in part, a plant or property engaged in the business of supplying services rendered by such public utility, shall first purchase and take over the property and plant of the public utility.

B. The property and plant shall become the property of the municipal corporation upon payment by the municipal corporation of the fair valuation thereof within eighteen months after the determination of the valuation in the manner hereinafter provided.

C. The fair valuation of the public utility shall be the equivalent of the compensation to be paid for the taking of private property for public use as provided by [Ariz.Rev.Stat. Ann. § 12–1111 et seq.], and the amount shall be determined by one of the following methods:

1. By agreement between the municipal corporation and the public utility.

2. By arbitrators chosen in a manner agreed upon at the time by the municipal corporation and the public utility.

three ways: by agreement between the city and the utility; by arbitrators agreed upon by both; or by a court in a condemnation proceeding. *Ibid.*

Prior to 1961, Consolidated sold several water systems to the City, enabling the City's water department to provide service to residents of the newly annexed areas. In early 1962, the City sought to acquire an additional portion of Consolidated's system serving a recently annexed area in northwest Phoenix. The City obtained an appraisal by an engineering firm, which estimated the value of the desired property to be between $2,400,000 and $2,600,000. The City offered to purchase the system at a price consistent with the estimate, but Stewart felt the system was worth over $3,500,000. On July 2, 1962, the City brought an action in the Superior Court of Maricopa County, Arizona, to condemn the property and determine its value. Under the state law in effect at that time, the City could obtain an order granting it immediate possession of the utility only if it deposited with the Superior Court an amount equal to double the probable damages to be sustained by the taxpayer as a result of the condemnation. Ariz.Rev.Stat.Ann. § 12–1116 C (amended 1967). The statute also provided that the parties "may stipulate as to the amount of the deposit, or for a bond in lieu of a deposit." *Id.* § 12–1116 F.

After the condemnation proceeding was filed, the parties entered into an agreement (the Agreement), which recited that the City desired to obtain immediate possession of the utility and "to secure the waiver of the statutory deposit requirement." The Agreement, which stated that it was not to become effective until approved by the Superior Court, provided that that court would proceed to determine the exact value of the utility in the condemnation action.

It stated that in the meantime, the City would obtain immediate possession of the utility, and would pay a total of $2,450,000 for the taxpayer's benefit pending the final decision by the Superior Court.[4] The Agreement contained the following provision for the payment of interest on the difference between the amount tendered and the final award:

Any sums which become payable by either party to the other under the terms of the final judgment entered in said condemnation action ... shall bear interest at the statutory rate of six percent per annum from the date City obtains possession of said utility property to the date of payment by the judgment debtor.

The Superior Court entered an order approving the Agreement on July 23, 1962. On September 3, 1964, it entered judgment in favor of the taxpayer for $3,400,000. The Arizona Supreme Court affirmed the Superior Court's judgment in June, 1966. *City of Phoenix v. Consolidated Water Co.,* 101 Ariz. 43, 415 P.2d 866. On October 18, 1966, the City paid the taxpayer an additional $1,180,611.61, of which $239,137.06 was interest required by the Agreement.

The taxpayer did not treat the interest payment as taxable income on his 1966 federal income tax return, taking the position that the payment was interest on a "governmental obligation" and therefore exempt from taxation under I.R.C. § 103(a).[5] The Commissioner audited the return and determined that the interest was taxable. The taxpayer challenged this determination in the Tax Court.

Relying on a number of decisions holding that interest on a condemnation award is not excludible under section 103(a), *e.g., United States Trust Co. v. Anderson,* 65 F.2d 575 (2d Cir.), *cert. denied,* 290 U.S. 683,

---

3. By a court of competent jurisdiction determining the compensation for the taking of private property for public use as provided by [Ariz.Rev.Stat.Ann. § 12–1111 et seq.].

4. The City paid Stewart $1,750,000 in cash and agreed to assume additional obligations valued at $700,000.

5. During the period at issue here, I.R.C. § 103(a) provided in relevant part:

(a) General Rule.—Gross income does not include interest on—

(1) the obligations of a State, a Territory, or a possession of the United States, or any political subdivision of any of the foregoing, or of the District of Columbia; ....

54 S.Ct. 120, 78 L.Ed. 589 (1933), the Tax Court concluded that the interest paid by the City pursuant to the Agreement did not fall within the scope of the statutory exemption.

> [T]he Agreement was integral to the condemnation proceedings and not a separate arrangement ... and this is determinative of the issue. The provision in the Agreement that provides for interest at the statutory rate of six percent is based on the terms of the final judgment entered *in the condemnation action.* The Agreement merely provided a means for [Stewart] to obtain funds quickly and for the City to take immediate possession of Consolidated properties without the posting of a bond. To separate the interest obligation from the condemnation award would be to ignore the express language of the Agreement.

43 T.C.M. at 1123 (emphasis in original).

### B

During the period in question, I.R.C. § 103(a)(1) excluded from gross income subject to taxation "interest on ... the obligations of a State, ... or any political subdivision of [a State] ...." See n. 5, *supra.* Similar provisions have been included in the income tax laws since the adoption of the Sixteenth Amendment, when it was widely believed that taxing the recipients of such interest would unconstitutionally burden the ability of state and local governments to borrow funds.[6] See *United States Trust Co., supra,* 65 F.2d at 577; *National Life Insurance Co. v. United States,* 277 U.S. 508, 521, 48 S.Ct. 591, 593, 72 L.Ed. 968 (1928). Congress' evident purpose in enacting the predecessor of section 103(a) was thus "to safeguard the borrowing power of the states and to prevent taxation which might impair its efficacy ...." *United States Trust Co., supra,* 65 F.2d at 578.

Where a government's obligation to pay interest arises solely by operation of law, however, taxing the recipient of such interest does not adversely affect the government's ability to borrow money. Recognizing that exemptions from taxation are to be construed narrowly[7], federal courts have held that the statutory exemption applies only to interest on obligations incurred by a governmental body pursuant to what is referred to as its "borrowing power." For example, the Court of Appeals for the Third Circuit applied this principle in *American Viscose Corp. v. Commissioner,* 56 F.2d 1033 (3rd Cir.), *cert. denied,* 287 U.S. 615, 53 S.Ct. 17, 77 L.Ed. 534 (1932), holding that interest paid by the United States on taxes illegally collected from the taxpayer was not exempt from taxation under § 213(b)(4)(C) of the Revenue Act of 1926, a companion provision to the predecessor of the section at issue here. See *Helvering v. Stockholms Enskilda Bank,* 293 U.S. 84, 87, 55 S.Ct. 50, 51, 79 L.Ed. 211 (1934) ("The scope of the word 'obligations' [as used in § 213(b)(4)(C) of the Revenue Act of 1926] must be narrowed ..., and not extended to include interest upon indebtedness not incurred under the borrowing power ....")

Consistent with this functional interpretation, other federal courts have long held that the exemption does not extend to interest paid by a state or local government in connection with a condemnation proceeding. Apparently the first decision so holding was in *United States Trust Co. v. Anderson, supra,* a case in which the Court of Appeals for the Second Circuit concluded that interest paid by the City of New York on a condemnation award was not exempt from taxation. The court, through Judge Augustus Hand, concluded:

> An award in condemnation, bearing interest, cannot be regarded as "issued" by a municipality, nor can taxation of the interest received upon such an award in any way affect the borrowing power of

---

6. More recently, the exemption afforded by section 103(a) has been characterized as "a kind of revenue sharing, which enables states and cities to borrow funds at an interest cost usually estimated to be about 70 percent of the rate paid on taxable obligations of similar qual-

ity." 1 B. Bittker, Federal Taxation of Income, Estates and Gifts ¶ 15.2.1, at 15–2 (1981) (footnote omitted).

7. See *e.g., Bingler v. Johnson,* 394 U.S. 741, 753, 89 S.Ct. 1439, 1446, 22 L.Ed.2d 695 (1969).

the state. There is no bargaining by the municipality in connection with the matter. The owner of the property condemned is obliged to sell it because of the exercise of the right of eminent domain.... It disregards the whole purpose of the exemption to apply it to interest upon obligations of a state which it can compel a citizen to take in exchange for the fair value of his property. The rate of interest is fixed by law, and neither it, nor the amount of the award adjudged as of the time of taking, is a matter over which he has any control.

65 F.2d at 578. Accord *Baltimore & Ohio R. Co. v. Commissioner,* 78 F.2d 460 (4th Cir.1935). See also *Kansas City Southern Railway Co. v. Commissioner,* 16 B.T.A. 665 (1929) (holding that interest paid by the United States on compensation awarded to a railroad for use of its facilities during the First World War was not exempt from taxation under the predecessor of section 103), *aff'd in part and rev'd in part,* 52 F.2d 372 (8th Cir.), *cert. denied,* 284 U.S. 676, 52 S.Ct. 131, 76 L.Ed. 572 (1931).

This principle was applied in *Holley v. United States,* 124 F.2d 909 (6th Cir.), *cert. denied,* 316 U.S. 685, 62 S.Ct. 1276, 86 L.Ed. 1757 (1942), a case in which the taxpayer claimed tax-exempt status for interest paid to him by the City of Detroit pursuant to an agreement under which the City was to pay two condemnation awards in annual installments with interest on the unpaid balance. The Court of Appeals for the Sixth Circuit held that the interest was not exempt from taxation:

> While the contract to defer payment was voluntary, the taking was not, all the proceedings being under the power of eminent domain and necessarily compulsory upon the [taxpayer]. The compensation therefore had to be that required in condemnation proceedings .... Under such circumstances, the interest is considered to be part of the award itself ....

*Id.* at 910.

The most recent appellate decision in this area apparently is *Drew v. United States,* 551 F.2d 85 (5th Cir.1977). After the taxpayer and a governmental body called the Trinity River Authority (TRA) were unable to agree on a price for a tract of land, the TRA filed condemnation proceedings. The parties then arrived at an agreement under which the taxpayer was offered three means of payment: cash, interest-bearing warrants (which were offered to permit the taxpayer to elect installment sale treatment under I.R.C. § 453), or a combination of the two. The TRA did not pay interest on the warrants directly; instead a sum equal to the face value of the warrants was deposited with an investment banking company, which invested the sum in securities offering interest at a rate in excess of that to be paid on the warrants. After deducting administration costs and the interest on the warrants, the banking company paid to the TRA any remaining interest. The Court of Appeals for the Fifth Circuit held that interest paid on the warrants was not exempt from taxation, concluding that the agreement to pay interest served no purpose for the TRA:

> The [use of warrants] imposed no burden upon TRA, it was not in need of funds to purchase the land involved. The necessary money had already been acquired through its initial bond issue. The manner in which the purchases were made was at the suggestion of and for the benefit of the landowners. The fact that TRA allowed them and other landowners to elect to receive compensation on a deferred basis, and thereby to obtain the additional tax advantage of installment reporting, did not convert the transaction to a voluntary one. Likewise, the incidental circumstance that TRA realized a profit on its escrow investments does not compel the conclusion that the issuance of the warrants was an exercise of its borrowing power to obtain credit.

*Id.* at 89 (footnotes omitted).[8]

In this appeal, Stewart concedes that "[i]t must now perhaps be regarded as settled

---

8. Chief Judge Brown, while agreeing fully with the panel's decision, emphasized that "this de-

law that 'interest received as part of a condemnation award is not interest on an obligation within the meaning of Section 103(a).'" Brief for Appellants 18 (quoting *Iske v. Commissioner,* 39 T.C.M. (CCH) 1161 (1980)). He contends, however, that the rationale underlying the condemnation exception has been undercut by decisions rendered after the *United States Trust Co.* case, *e.g., Kings County Development Co. v. Commissioner,* 93 F.2d 33 (9th Cir.1937), *cert. denied,* 304 U.S. 559, 58 S.Ct. 941, 82 L.Ed. 1527 (1938), and *Commissioner v. Meyer,* 104 F.2d 155 (2d Cir.1939).

At issue in the *Kings County* case was the tax status of interest paid by a water storage district pursuant to agreements under which the district purchased several tracts of land. This Court held that the interest was exempt from taxation under the predecessor of section 103(a), rejecting the contention that the term "obligation" used in the predecessor of section 103(a) referred only to a security such as a bond. The Court distinguished the *United States Trust Co.* and *American Viscose* cases, stating that "[i]n both of these cases the obligations discussed were not based upon contractual relationships between the parties as in the case at bar, but were for claims arising by operation of law." 93 F.2d at 34.

In *Commissioner v. Meyer, supra,* the Court of Appeals for the Second Circuit held that interest paid by a municipality on a promissory note given to pay for a tract of land fell within the scope of the exemption created by the predecessor of section 103(a). The Court distinguished its earlier decision in the *United States Trust Co.* case, stating that the interest received by the taxpayer there "was payable not by virtue of any contract under which credit was obtained but because required by law as part of the just compensation for what was condemned . . . ." 104 F.2d at 156.

■ We perceive no conflict between the principles articulated in these two lines of decisions. The condemnation cases simply recognize that, when a government is obligated by law to pay interest at a fixed rate, taxing the recipients of that interest cannot adversely affect the ability of the government to borrow funds. The latter decisions no more than acknowledge that a governmental body may exercise its borrowing power by means other than the flotation of securities. Both these principles may come into play, however, when a government's obligation to pay interest arises from an agreement entered in connection with a condemnation proceeding. In such circumstances, courts must determine whether the agency's obligation to pay interest arises by operation of law, rather than as the result of voluntary bargaining. Where the obligation to pay interest is effectively fixed, the purpose of the statutory exemption—reducing the burden of borrowing for state and local governments—cannot be served, and the interest is therefore not exempt under § 103(a).

■ Applying these principles to the instant case, we conclude that the Tax Court correctly determined that the interest received by the taxpayer is not exempt from taxation. During the period in question, Ariz.Rev.Stat. § 12–1123 B provided that "[i]f an order is made [in a condemnation proceeding] letting the plaintiff into possession prior to final judgment, the compensation and damages awarded shall draw legal interest from the date of the order." The Superior Court entered just such an order in the condemnation action giving rise to the instant case, approving the Agreement under which the City obtained immediate possession of the utility and Stewart received a $2,450,000 interim payment.[9]

cision is for this day and train only." 551 F.2d at 89.

**9.** During the period in question, Ariz.Rev.Stat. § 12–1116 permitted a city to obtain immediate possession of a property before the completion of condemnation proceedings. See p. 4, *supra.* Section 12–1116 F authorized parties in such proceedings to stipulate to the amount of a deposit or bond in lieu of the double deposit otherwise required as security for an order granting immediate possession. The Agreement between the City and Stewart, which was entered as a stipulation by the Superior Court, provided for a $2,450,000 interim payment, explaining that the Agreement was entered in

Thus, the City's obligation to pay interest at what the Agreement referred to as the "statutory" rate arose by operation of the Arizona statute as the result of the Superior Court's order approving the Agreement.

In sum, although the taxpayer's agreement to surrender immediate possession of the utility was voluntary, the City's obligation to pay interest at the legal rate was not. We therefore affirm the Tax Court's decision that the interest was not exempt under section 103(a).

## II

### A

The second issue concerns the tax liability for a capital gain resulting from the sale of securities contributed by Stewart to John Porter Manufacturing Company (JPMC), a corporation controlled by Stewart, and thereafter sold by JPMC.

Sometime before March 15, 1962, the taxpayer acquired controlling interests in JPMC, which was engaged in the manufacture of western wear, and in N. Porter Mercantile Company (Porters), which sold saddles, western clothing, and related items. Porters eventually was declared bankrupt, and JPMC purchased some of its assets, including its retail stores.

After he gained control of JPMC, the taxpayer personally lent, and caused other corporations he controlled to lend, substantial sums to JPMC. On June 30, 1965, JPMC owed Stewart $313,559.60, all of which was subordinated to the claims of other creditors. Sometime thereafter,

Stewart agreed to convert $230,000 of that debt into an equal amount of JPMC preferred stock, apparently to bolster the financial condition of the corporation. Although no stock certificates were issued, the corporate books reflected the transfer of $230,000 from debt to capital account. In December 1966, JPMC cancelled all of its outstanding stock ($230,000 in preferred and $10,000 in common stock), and increased its retained earnings account by $240,000.

As of December 31, 1966, JPMC owed the taxpayer and business entities he controlled the following amounts:

| Creditor | Amount |
|---|---|
| Taxpayer | $224,284.00 |
| Stewart Motors | 8,700.00 |
| Stewart Property Management Co. (SPMC, earlier known as B. Bar L. Land & Cattle Co.) and Stewart Management Co. | 140,753.20 |
| Moo Soo Ranch | 3,000.00 |
| Wilderness Enterprises | 1,028.97 |
| Consolidated Water Co. | 6,041.97 |
| TOTAL | $383,808.14 |

The taxpayer personally guaranteed all loans made to JPMC, and subordinated his own claims to those of other creditors.

During the five-year period ending June 30, 1967, JPMC reported net operating losses making available to it a total net operating loss carryover of $326,272.32 on that date. From January through March 1967, the taxpayer contributed to JPMC certain appreciated securities, in which he had a basis of $40,814.82.[10] JPMC sold the securi-

order to permit the City to obtain immediate possession of the water utility and "to avoid the statutory requirement ... of depositing with the Court double the amount of probable damages which may be sustained by Stewarts as a result of [the] taking." In its opinion affirming the Superior Court's decision in the condemnation proceedings giving rise to the

instant case, the Arizona Supreme Court stated that "the City took possession of the property under A.R.S. § 12–1116 ...." *City of Phoenix, supra,* 101 Ariz. at 44, 415 P.2d at 867.

**10.** The transactions, as summarized by the Tax Court, are as follows:

| Date of Transfer to JPMC and Sale by JPMC | Number of Shares | Taxpayer's Basis | Net Sales Proceeds | Net Capital Gain |
|---|---|---|---|---|
| 1/03/67 | 1,441 | $ 4,445.51 | $ 45,397.71 | $ 40,952.20 |
| 1/17/67 | 2,000 | 6,170.04 | 64,029.77 | 57,859.73 |

ties on the same days it received them, realizing net sales proceeds [11] of $268,270.40 and a net capital gain of $228,225.57. In return for the securities, JPMC issued the taxpayer 4,000 shares of $10 par common stock.

JPMC retained no more than $35,193.34, or 13 percent of the proceeds from the sale of the securities. As is described more fully below, see pp. 990–991, *infra*, the remainder was paid to Stewart, to entities he controlled, and to Valley National Bank, which was not shown to be a creditor of JPMC.

Invoking section 351 of the Internal Revenue Code [12], taxpayer did not report a capital gain from the transfer or sale of the securities. Instead, JPMC declared a $228,225.57 capital gain on its 1967 federal income tax return. Because of the corporation's substantial carryover losses, it paid no income tax for 1967. JPMC went out of business in 1970.

The Commissioner issued a notice of deficiency for the amount of the capital gain, which states:

It is determined that you realized a capital gain of $228,225.57 in the tax year 1967 when you transferred various securities to John Porter Manufacturing Co., purportedly within the purview of Sec. 351 of the Code. It is determined that

such transfer was for the purpose of avoidance and/or evasion of taxes. Accordingly, the long-term capital gain realized thereon of $228,225.57 is reallocated to you within the purview of Sec. 482 of the Internal Revenue Code.

The taxpayer sought relief from this determination in the Tax Court.

## B

### 1

Sometime before the commencement of the trial, the Commissioner gave the taxpayer notice of his intention to rely on what the parties have referred to as the "substance-over-form doctrine," see *infra*, rather than I.R.C. § 482. The parties disagree about when such notice first was given; the Commissioner contends that oral notice was given at a pretrial conference several months before the trial; counsel for the taxpayer vigorously denies receiving any such notice. The parties agree, however, that the Commissioner filed and served on opposing counsel a three-page trial memorandum on the day before trial. On the first page, in a section entitled "ISSUES," the following paragraph appears:

2. Whether capital gain in the amount of $228,225.57 realized on the sale of

| Date of Transfer to JPMC and Sale by JPMC | Number of Shares | Taxpayer's Basis | Net Sales Proceeds | Net Capital Gain |
|---|---|---|---|---|
| 2/07/67 | 2,000 | $ 6,170.04 | $ 66,742.09 | $ 60,572.05 |
| 3/02/67 | 2,000 | 13,629.22 | 28,570.00 | 14,940.78 |
| 3/02/67 | 2,000 | 10,400.01 | 64,300.82 | 53,900.81 |
| | | $40,814.82 | $269,040.39 | $228,225.57 |

11. Apparently, JPMC also used a small portion of the proceeds to purchase and sell other securities at a net loss of $769.99.

12. I.R.C. § 351(a) provides in relevant part:
(a) No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation and immediately after the exchange such person

or persons are in control . . . of the corporation. . . .
Where a controlling shareholder receives money or other property, in addition to stock, in exchange for property transferred to the corporation, section 351(b) provides for recognition of gain, "but not in excess of—the amount of money received, plus the fair market value of such other property received . . . ."

stock by [JPMC] on the same day contributed to it by ... Spencer D. Stewart is taxable to [Stewart].

On the second page, in a section entitled "FACTS," the Commissioner alleged:

2. In a series of separate transactions, ... Spencer D. Stewart transferred certain personally owned stocks to [JPMC] which, in turn, sold such stocks, on the same dates contributed, for large gains. The majority, if not all, of the resulting proceeds were paid to or for the benefit of ... Spencer D. Stewart. [The Commissioner] has attributed the total gain realized from the sale of such securities to [taxpayer] as long-term capital gains.

On the third page, in a section entitled "LEGAL PRINCIPLES," the memorandum states:

2. The transfer of appreciated property followed by the sale of such property by the transferee will be treated for tax purposes as a sale by the transferor where such transferee was used merely as a conduit through which to pass title. *Commissioner v. Court Holding Co.,* 324 U.S. 331 [65 S.Ct. 707, 89 L.Ed. 981] (1945); *Hallowell v. Commissioner,* 56 T.C. [600] (1971).

Taxpayer first objected to what he now contends was the Commissioner's untimely invocation of the substance-over-form doctrine in his post-trial reply brief. He did not object either at trial or in his first post-trial brief, assertedly because he did not read the Commissioner's trial memorandum and did not otherwise receive notice of the Commissioner's alleged change of position until the Commissioner served his post-trial brief.

The Tax Court considered and rejected the taxpayer's objection, concluding that "the notification given prior to trial to [Stewart] of [the Commissioner's] reliance on the substance-over-form doctrine was sufficient to overcome any claim by [Stewart] that he was surprised or disadvantaged." 43 T.C.M. at 1124.

█ In this Court, counsel for the taxpayer contends that he was under no obli-

gation to read the Commissioner's three-page trial memorandum because it is not a pleading required by the Tax Court Rules. We disagree. Counsel for the Commissioner called counsel's attention to the trial memorandum at the very beginning of the trial when he agreed to forgo making an opening statement, stating that "[w]e feel that our trial memorandum covers the issues adequately." To countenance counsel's failure to read his opponent's trial memorandum in such circumstances is tantamount to permitting counsel to ignore with impunity his adversary's opening statement. We decline to do so.

█ Counsel for the taxpayer also argues that, even if he was under an obligation to read the Commissioner's trial memorandum, his opponent was under a corresponding obligation to read the taxpayer's trial memorandum, which, he contends, manifests a belief that the Commissioner intended to rely on section 482, and to inform counsel for the taxpayer of this misapprehension. For the reasons set forth below, we conclude that the taxpayer's trial memorandum does not manifest a clear misapprehension of the controlling legal question and that the taxpayer failed to establish that he was given inadequate notice of the Commissioner's invocation of the substance-over-form doctrine.

## 2

█ Without question, the most appropriate times for the Commissioner to inform a taxpayer of the legal theories on which he intends to rely are first in the notice of deficiency and then in the Commissioner's answer in the Tax Court. *Commissioner v. Transport Manufacturing & Equipment Co.,* 478 F.2d 731, 736 (8th Cir.1973). But the Commissioner does not necessarily forfeit his right to rely on a theory by failing to raise it at the preferred times. "The basic consideration is whether the taxpayer is surprised and disadvantaged when the Commissioner has failed to plead [the theory in a timely fashion] ...." *Ibid.* See *BASF Wyandotte Corp. v. Commissioner,* 532 F.2d 530 (6th Cir.1976); *Rubin v. Com-*

*missioner,* 56 T.C. 1155, 1163 (1971), *aff'd,* 460 F.2d 1216 (2nd Cir.1972). "Notice only is required; it is deception that is prohibited." *Nor-Cal Adjusters v. Commissioner,* 503 F.2d 359, 362 (9th Cir.1974).

To evaluate taxpayer's inadequate notice claim, we must first briefly examine the nonrecognition provision, section 351, and then compare the two theories relied upon by the Commissioner to deny nonrecognition treatment in the series of transactions at issue: section 482 [13]—the provision originally cited by the Commissioner, and what the parties refer to as the "substance-over-form doctrine." Section 351 affords nonrecognition treatment to transfers of property to a corporation by a controlling shareholder where the transfer is solely in exchange for the corporation's stock. See n. 12, *supra.* Congress adopted the predecessor of that provision to permit taxpayers to avoid recognition of a gain or loss in transactions with a controlled corporation "where in a popular and economic sense there has been a mere change in the form of ownership and the taxpayer has not really 'cashed in' on the theoretical gain, or closed out a losing venture." *Portland Oil Co. v. Commissioner,* 109 F.2d 479, 488 (1st Cir.), *cert. denied,* 310 U.S. 650, 60 S.Ct. 1100, 84 L.Ed. 1416 (1940). See S.Rep. No. 275, 67th Cong., 1st Sess. 11 (1921); *Halliburton v. Commissioner,* 78 F.2d 265, 269 (9th Cir.1935).

Section 482 authorizes the Commissioner to allocate income between "two or more organizations, trades, or businesses ... owned or controlled ... by the same interests, ... if he determines that such ... allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses." Congress enacted the predecessor of section 482 to prevent the evasion of taxes through such means as "shifting of profits, the making of fictitious sales and other methods frequently adopted for the purpose of 'milking.'" H.R.Rep. No. 2, 70th Cong., 1st Sess. 16 (1927); S.Rep. No. 960, 70th Cong., 1st Sess., 24 (1928). See *Commissioner v. First Security Bank of Utah,* 405 U.S. 394, 400, 92 S.Ct. 1085, 1089, 31 L.Ed.2d 318 (1972). The provision is silent about *what* constitutes tax evasion or *when* reallocation is necessary to reflect clearly the income of the entities in question. A leading commentary has described it as "an amalgam of several important themes and policies of the tax law: tax-avoidance principles, assignment-of-income notions, general deduction theories, and clear reflection of income under the parties' accounting methods." B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders ¶ 15.06, at 15–16 (4th ed. 1982).

What the parties refer to as "the substance-over-form doctrine" is part of a well established body of common law addressing the sometimes elusive distinction between what are ultimately described as "tax avoidance" and "tax evasion." Typically, a "substance-over-form" case arises when a taxpayer chooses, as is his right [14], to structure a transaction so that it satisfies the formal requirements of a provision of the Internal Revenue Code in order to minimize his tax liability. The Commissioner, as is his duty, may seek to deny legal effect to the transaction, claiming that its sole purpose was to "evade" taxation. In so doing, he may rely on a body of law described by Professor Bittker as follows:

In applying the Internal Revenue Code to particular transactions, the courts frequently distinguish between "tax avoidance" and "tax evasion" and between

**13.** In this Court, the Commissioner concedes that § 482 cannot be applied to the instant case because Stewart does not constitute an organization, trade or business within the meaning of the provision. See *Foglesong v. Commissioner,* 691 F.2d 848 (7th Cir.1982).

**14.** See *e.g., Helvering v. Gregory,* 69 F.2d 809, 810 (2d Cir.1934), *aff'd,* 293 U.S. 465, 55 S.Ct.

266, 79 L.Ed. 596 (1935) (L. Hand, J.) ("Any one may so arrange his affairs that his taxes shall be as low as possible; he is not bound to choose that pattern which will best pay the Treasury; there is not even a patriotic duty to increase one's taxes.") See generally Chirelstein, Learned Hand's Contribution to the Law of Tax Avoidance, 77 Yale L.J. 440 (1968).

"form" and "substance," assert that transactions are to be taken at face value for tax purposes only if they are imbued with a "business purpose" or reflect "economic reality," and integrate all steps in prearranged plan rather than give effect to each step as though it were a separate transaction. These presuppositions or criteria are so pervasive that, in combination, they resemble a preamble to the Code, describing the framework within which all statutory provisions are to function.

Bittker, Pervasive Judicial Doctrines in the Construction of the Internal Revenue Code, 21 How.L.J. 693, 695 (1978).

■ There are circumstances, however, "when form—and form alone—determines the tax consequences of a transaction," *id.* at 704, regardless of its underlying "substance" or "purpose." Reference to the vague terms "form" and "substance," which Judge Learned Hand pointedly referred to as "anodynes for the pains of reasoning [15]," is therefore inadequate to determine the tax treatment of a particular transaction. Instead, courts must make a more specific inquiry, finding what the facts are and deciding whether those facts fall within the intended scope of the Internal Revenue Code provision at issue. See Isenbergh, Musings on Form and Substance in Taxation (Book Review), 49 U.Chi.L.Rev. 859, 879–83 (1982). Cf. *Hillsboro National Bank v. Commissioner,* —— U.S. ——, ——, 103 S.Ct. 1134, 1144, 75 L.Ed.2d 130, 147 (1983) (In applying the judicially developed tax-benefit rule, "[a] court must consider the facts and circumstances of each case in the light of the purpose and function of the provisions granting the deductions.")

The Commissioner relies here on a number of "substance-over-form" cases holding that a transfer of assets between related entities is to be denied legal effect when the transferee is a "mere conduit" between the transferor and a third party. The leading case in this general area is *Commission-*

er v. Court Holding Co., 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981 (1945). There the respondent corporation had reached an oral agreement for the sale of an apartment house. Upon the advice of counsel, however, the corporation called off the sale, and declared a "liquidating dividend" in which the building was deeded to the controlling shareholders, who then completed the sale. The Tax Court concluded that, despite the transfer of legal title, the gain from the sale should be attributed to the corporation. The Supreme Court affirmed, and offered the following reasons:

The incidence of taxation depends upon the substance of a transaction. The tax consequences which arise from gains from a sale of property are not finally to be determined solely by the means employed to transfer legal title. Rather, the transaction must be viewed as a whole, and each step, from the commencement of negotiations to the consummation of the sale, is relevant. A sale by one person cannot be transformed for tax purposes into a sale by another by using the latter as a conduit through which to pass title. To permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress.

324 U.S. at 334, 65 S.Ct. at 708 (footnote omitted).

The other case primarily relied upon by the Commissioner, *Hallowell v. Commissioner,* 56 T.C. 600 (1971), arose from facts similar to those presented here. The taxpayer and his wife owned over 50 percent of the outstanding stock of a corporation that had substantial net operating loss carryovers. Like the taxpayer here, they had lent funds to the corporation. In a series of transactions over a three-year period, Hallowell transferred greatly appreciated IBM stock to the corporation, which soon thereafter sold it on the open market. Dur-

---

**15.** *Commissioner v. Sansome,* 60 F.2d 931, 933 (2d Cir.), *cert. denied,* 287 U.S. 667, 53 S.Ct. 291, 77 L.Ed. 575 (1932).

ing the same period, the corporation made payments to the taxpayers, ostensibly as repayments of indebtedness, in amounts that roughly corresponded to the gains from the sale of the stocks. Relying chiefly on the *Court Holding Co.* case, the Tax Court ruled that Hallowell, not the corporation, actually "sold" the stock, and that the corporation "served only as a conduit to that end." 56 T.C. at 607.

> While [the corporation] was selling the transferred property, it was also making substantial parallel distributions to or for the benefit of petitioners. The conclusion is virtually inescapable that the sales were made for the benefit of Hallowell and his wife. The receipt of such benefits argues strongly for attributing the gains on the sales to Hallowell.

*Id.* at 609 (footnote omitted). Accord *Palmer v. Commissioner,* 354 F.2d 974 (1st Cir. 1965) (per curiam), aff'g, 44 T.C. 92; *Abbott v. Commissioner,* 23 T.C.M. 445 (CCH) (1964), aff'd, 342 F.2d 997 (5th Cir.1965) (per curiam). See also *Minnesota Tea Co. v. Helvering,* 302 U.S. 609, 58 S.Ct. 393, 82 L.Ed. 474 (1938).

As the Tax Court below stated, the substance-over-form doctrine and section 482 "overlap considerably...." 43 T.C.M. at 1124, n. 10. "Transactions that would be vulnerable to attack by the Internal Revenue Service with the substance-over-form doctrine are usually at least equally vulnerable under IRC § 482, and the two are often invoked in tandem by government briefs." Bittker, *supra,* at 709. Indeed, when the Commissioner exercises his authority under section 482 to reallocate the incidents of a transaction between two organizations, trades or businesses, reference may be had to the principle articulated in the *Court Holding Co.* case and its progeny to determine whether reallocation is necessary to avoid tax evasion. *Southern Bancorporation v. Commissioner,* 67 T.C. 1022, 1026 (1977).

Both section 482 and the substance-over-form doctrine have been held to limit the extent to which a taxpayer may obtain nonrecognition treatment under section 351

for a transaction that appears formally to fall within the bounds of the provision. See *e.g., Wolf v. Commissioner,* 357 F.2d 483 (9th Cir.1966) (substance-over-form doctrine); Treas.Reg. § 1.482–1(d)(5) (1982); *Rooney v. United States,* 305 F.2d 681 (9th Cir.1962), and *National Securities Corp. v. Commissioner,* 137 F.2d 600 (3rd Cir.), *cert. denied,* 320 U.S. 794, 64 S.Ct. 262, 88 L.Ed. 479 (1943) (section 482). See also B. Bittker & J. Eustice, *supra,* ¶ 3.17, at 3–66; Berger, Gilman, & Stapleton, Section 482 and the Nonrecognition Provisions: An Analysis of the Boundary Lines, 26 Tax Lawyer 523, 527, n. 17 (1973); Adess, The Role of Section 482 in Nonrecognition Transactions— The Outer Edges of its Application, 57 Taxes 946, 947 & n. 13, 961–62 (1979). And with one exception discussed below, the inquiry under either doctrine is essentially the same in the circumstances presented here.

■ Under section 482, the relevant inquiry is whether the proceeds from the sale of the transferred property must be allocated to the transferor "in order to prevent evasion of taxes or clearly to reflect ... income." To rebut such a determination by the Commissioner, the taxpayer must establish that *not* attributing the gain to the taxpayer more clearly reflects the proper allocation of income. To do so, he would be required to establish that he did not "cash in" on the gain—in effect, that the transaction *was* of the kind intended to receive nonrecognition treatment under section 351. Similarly, under what is described as the substance-over-form doctrine, the controlling inquiry is whether the corporate recipient was merely a conduit for the sale of assets by the transferor; if so, the transferor "cashed in" on the gain, and nonrecognition treatment is inappropriate under section 351.

Section 482, however, cannot be invoked in one situation where the substance-over-form doctrine may be applied—where the transaction at issue was not between two or more "organizations, trades, or businesses" within the meaning of the provision. See *Foglesong v. Commissioner,* 691 F.2d 848 (7th Cir.1982). Pointing to this, the taxpay-

er contends that he was prejudiced by the Commissioner's belated invocation of the substance-over-form doctrine because the evidence at trial was directed solely at establishing that the transfer of the appreciated securities to JPMC was made by an individual, not an organization, trade or business.

His position is not supported by the record. The taxpayer's petition to the Tax Court manifests an understanding of the Commissioner's legal theory. It alleges that the Commissioner erred by "[t]reating sales in 1967 of securities previously contributed by [taxpayer] to [JPMC] as though such sales had been made by [taxpayer] rather than by [JPMC]." In addition, it is clear that, contrary to the taxpayer's contention, his trial memorandum did not characterize the controlling issue as whether Stewart constituted an "organization, trade or business" within the meaning of section 482.[16]

At the trial, the taxpayer's evidence related primarily to his reason for giving the securities to JPMC—allegedly to improve the corporation's financial situation. He testified about the use made of the proceeds of the sales, specifically denying, under questioning by his counsel, that the funds were used to pay him a dividend, salary or compensation, or to purchase from Stewart stock he held in JPMC. The taxpayer also introduced considerable documentary evi-

dence, as well as accountants' testimony, to establish the financial condition of JPMC before and after the transactions at issue. Such evidence was offered in support of the taxpayer's contention that the transfer of the securities had a valid business purpose; it had no relevance to the question whether Stewart was engaged in a trade or business within the meaning of section 482.

■ In sum, the pleadings and evidence offered by the taxpayer amply support the Tax Court's finding[17] that the taxpayer failed to establish that he was surprised and prejudiced by the Commissioner's invocation of the substance-over-form doctrine. Cf. *Fox Chevrolet v. Commissioner,* 76 T.C. 708 (1981) (barring the Commissioner from relying on a theory about which the taxpayer received notice during the week before trial because the record, including the parties' trial memoranda, clearly indicated that the taxpayer was not aware of the issue).

### 3

■ The taxpayer also contends that the Commissioner's invocation of the substance-over-form doctrine constitutes a "new matter" as to which the Commissioner must bear the burden of proof. See Tax Court Rule 142(a). It is well settled that the assertion of a new theory that merely clarifies the original determination, without requiring the presentation of different evidence, does not shift the burden of proof.

---

**16.** Although the trial memorandum summarizes the controlling issue as whether the taxpayer may be held liable for the capital gain from the sale of the securities at issue "[u]nder IRC § 482," it stresses the taxpayer's contention that the proceeds of the sale were used "to pay the legitimate debts of [the] corporation." No mention whatsoever is made of the taxpayer's contention that section 482 is inapplicable because the transaction at issue did not involve two organizations, trades, or businesses within the meaning of the statute.

**17.** Findings of fact by the Tax Court, like factual determinations made by a district court, are not to be set aside in this Court unless they are clearly erroneous. 26 U.S.C. § 7482 (1976); Fed.R.Civ.P. 52. See *Commissioner v. Duberstein,* 363 U.S. 278, 291, 80 S.Ct. 1190, 1199, 4 L.Ed.2d 1218 (1960); *Goldstein v. Commissioner,* 298 F.2d 562, 566 (9th Cir.1962). The tax-

payer contends, however, that because the case was decided by a judge who did not hear the evidence, see n. 2, *supra,* "the clearly erroneous standard does not apply and there should be no presumption of correctness in favor of the lower Court's findings." Brief for Appellants at 15.

Although the view advanced by the taxpayer is supported by some decisions in other Circuits, *e.g., Orvis v. Higgins,* 180 F.2d 537 (2d Cir.), *cert. denied,* 340 U.S. 810, 71 S.Ct. 37, 95 L.Ed. 595 (1950), it was rejected by this Court in *Lundgren v. Freeman,* 307 F.2d 104, 113–15 (9th Cir.1962). *Lundgren* remains the law in this Court. *United States v. Chesher,* 678 F.2d 1353, 1358, n. 3 (9th Cir.1982). See *e.g., Del Mar Engineering Laboratories v. Physio-Tronics, Inc.,* 642 F.2d 1167, 1169, n. 2 (9th Cir. 1981); *United States v. Mountain States Constr. Co.,* 588 F.2d 259, 264, n. 5 (9th Cir. 1978).

See *Achiro v. Commissioner,* 77 T.C. 881, 890 (1981). For the reasons stated above, we affirm the Tax Court's conclusion that the substance-over-form doctrine is so closely related to the statute earlier relied upon by the Commissioner that the Commissioner's invocation of the doctrine does not constitute a new matter; the burden of proof therefore remains on the taxpayer. See *Abatti v. Commissioner,* 644 F.2d 1385, 1390 (9th Cir.1981).

### C

The Tax Court found that JPMC distributed the proceeds from the sale of the transferred securities as follows:

> Of the $268,270.40 net sales proceeds, JPMC distributed $64,500.00 or approximately 24 percent directly to [Stewart] or to a third party (Valley National Bank) for [Stewart's] benefit. An additional $144,473.27 or approximately 53.86 percent went to either Consolidated, a sole proprietorship owned by [Stewart], or to SPMC, a company in which [Stewart] held a 45 percent (and effectively controlling) interest. It is also revealing that JPMC distributed $74,835.41 to Consolidated when the record indicates that the sums advanced to JPMC by Consolidated totaled only $6,041.97. Although [Stewart] claims that the transfer of the securities was intended to improve JPMC's financial position, we fail to see how the company's position was measurably improved in light of the fact that JPMC retained no more than $35,193.34, or 13 percent of the sale proceeds, and most, if not all, of the balance went either to [Stewart], one of his many other businesses, or to Valley National Bank.

43 T.C.M. at 1125 (footnote omitted).[18]

The taxpayer contends that this case is controlled by *Smalley v. Commissioner,* 32 T.C.M. (CCH) 373 (1973). The Tax Court held there that gain from the sale by a controlled corporation of securities transferred to it in exchange for corporate stock was properly attributed to the corporation because the taxpayer had established two sufficient non-tax reasons for the transfer: a creditor of the corporation strongly advocated the transfer; and the taxpayer believed it was necessary to do so in order to strengthen the corporation's balance sheet to facilitate ongoing negotiations for the sale of the business.

Stewart asserts that the *Smalley* case is controlling because here, as there, the overall objective for the transfer and sale of the securities was to reduce the corporation's indebtedness to improve its attractiveness to potential buyers. The Tax Court, however, distinguished the *Smalley* case, finding that "[t]he record does not establish that a single JPMC creditor, other than [Stewart] or businesses that [Stewart] owned or controlled, was paid any of the proceeds from the sale of these stocks.... [or] that VNB, the other identifiable distributee, was a creditor of JPMC." 43 T.C.M. at 1122. "Furthermore, the record does not indicate that outside creditors or business associates, potential or actual, were demanding that JPMC strengthen its position as a prerequisite to any dealing." *Id.* at 1125. It concluded that the taxpayer had "not shown any valid business purpose, other than tax savings, for the formalistic 'transfer' of his stocks to JPMC in exchange for its shares; that JPMC was acting merely as a conduit for [Stewart]; and that [Stewart] was the true seller of the securities." *Ibid.*

Relying on the legion of cases acknowledging that a taxpayer is free to arrange

---

**18.** Elsewhere in its opinion, the Tax Court listed the distribution of the proceeds in the following manner:

> JPMC used some of the proceeds to repay $42,500 to [Stewart], $69,637.86 to [SPMC], ... $74,835.41 to Consolidated ..., and $22,633 to [VNB]. In turn, of the sale proceeds given to SPMC by JPMC, $10,000 was paid to VNB and $12,300 was given to [Stewart]. The $74,835.41 paid to [Consolidated] by JPMC was, in turn, distributed by Consolidated (together with additional funds) to SPMC and VNB in the amounts of $52,503.79 and $46,435.41, respectively.

43 T.C.M. at 1122.

As the Tax Court recognized, the figures submitted by the taxpayer do not add up to the net sales proceeds; the discrepancy was not explained.

his affairs in the manner calculated to minimize his tax liability, *e.g., Gregory v. Helvering,* 293 U.S. 465, 469, 55 S.Ct. 266, 267, 79 L.Ed. 596 (1935), Stewart counters that he was free to avail himself of the benefits of section 351 and under no obligation to select another means of reducing JPMC's indebtedness that would result in greater tax liability for him. We conclude, however, that section 351 was not intended to afford nonrecognition treatment in the circumstances presented here.

 Section 351 affords nonrecognition treatment to transfers of property from a shareholder to a controlled corporation in exchange for the corporation's stock. As explained above, see pp. 986–987, *supra,* the provision was enacted to permit taxpayers to avoid recognizing gains or losses on the transfer of property when they did not actually "cash in" on the gain or loss, but instead only transferred ownership of the property. See *Portland Oil Co. v. Commissioner, supra.* In this case, the taxpayer *did* "cash in" on the appreciated value of the securities; no sooner did JPMC receive the securities than it sold them and distributed most of the proceeds to the taxpayer and entities controlled by him. The Tax Court found that the loan repayments were without business purpose and that JPMC did not make the payments to accommodate the interests of an actual or potential creditor or investor; nor were they made as part of a regularly scheduled repayment of debt. In essence, the payments were simply the proceeds of a contrived sale of the appreciated securities by Stewart.

"It is for the trial court, upon consideration of an entire transaction, to determine the factual category in which a particular transaction belongs." *United States v. Cumberland Public Service Co.,* 338 U.S. 451, 456, 70 S.Ct. 280, 282, 94 L.Ed. 251 (1950). Based on the record before us, we cannot conclude that the Tax Court's determination that JPMC was merely a conduit for the sale of the appreciated securities by

Stewart is clearly erroneous. Because the taxpayer did "cash in" on the value of the appreciated securities transferred to JPMC, he was not entitled to the benefits of section 351.[19] Accordingly, the decision of the Tax Court is affirmed.

*It is so ordered.*

---

19. The taxpayer did not contend, either before the Tax Court or on this appeal, that he was entitled not to report as income the portion of the proceeds from the sale of the transferred securities retained by JPMC. That question is therefore not before us.