JERRY C. JACOBS AND ISABEL F. JACOBS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Jacobs v. Commissioner
Docket No. 23044-81.
United States Tax Court
T.C. Memo 1985-609; 1985 Tax Ct. Memo LEXIS 23; 51 T.C.M. (CCH) 105; T.C.M. (RIA) 85609; December 16, 1985. Jerry C. Jacobs and Isabel F. Jacobs, pro se. Avery Cousins III, for the respondent. KORNER
MEMORANDUM FINDINGS OF FACT AND OPINION KORNER, Judge: Respondent determined deficiencies in petitioners' income tax as follows: Taxable Year
Deficiency
1973
$13,469
1974
7,949
1975
5,466
1976
30
1978
813
The issues for decision are: (1) Whether the transaction between petitioners and Southern Star Land and Cattle Co., Inc., was in substance a sale of 5 exotic bred cows by the corporation to petitioners; (2) whether a nonrecourse note given by petitioners to Southern Star Land and Cattle Co., Inc. was a valid indebtedness; *25 and (3) whether the cattle breeding investment [1] was an activity engaged in for profit. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulations of fact and exhibits attached thereto are incorporated herein by this reference. Jerry C. Jacobs ("Jerry" or "petitioner") and Isabel F. Jacobs ("Isabel"), were husband and wife and residents of Bronx, New York at the time their petition was filed. Jerry and Isabel (hereinafter referred to, collectively, as "petitioners") filed joint income tax returns for the taxable years 1973 through 1978, using the cash method of accounting. During the years in issue, Jerry and Isabel were employed as a physician and school teacher, respectively. Petitioners were made aware of a cattle breeding program offered by Southern Star Land and Cattle Co., Inc. ("Southern Star") by their accountant, Conrad Polly, in 1973. Southern Star was incorporated *26 under the laws of the State of Florida in 1970, and was founded by Neal Levine and Harry Epstein. During the years in issue, Southern Star operated three ranches, located in Citra, Florida; Cassoday, Kansas; and Marshfield, Missouri. Polly visited the Southern Star ranch located in Citra, Florida. Polly had no knowledge of cattle breeding. Polly did not own any cattle, nor did he subscribe to any cattle publications. Polly did not belong to any cattle organizations. Petitioners met with Polly and Harry Epstein at petitioners' home. The purpose of the meeting was to introduce the program offered by Southern Star and explain the advantages of investing in it to petitioners. Prior to entering into agreements with Southern Star, petitioners had not engaged in any cattle breeding activity.Polly received a $2,000 commission from Southern Star for getting petitioners to participate in the program. Petitioners were provided with a 12-year projection of the tax benefits to be derived from an investment in Southern Star, dated January 1, 1973. The projection was of an investment in 1973 consisting of a purchase of 5 cows at $7,200 per head. For a total investment of $20,330 (principal *27 payment of $1,000, 6 percent estimated interest payments totaling $6,330, and maintenance payments of $13,000), all of which were to be made during the first three years, it was represented that an investor could anticipate the following deductions and tax benefits: 6 percent
(50%)
7 % Tax
Estimated
Tax
Tax
Investment
Interest
Maintenance
Depreciation
Write off
Saved
Credit
$6,330
$13,000
$24,336
$43,666
$21,833
* $2,520
Petitioners were also provided with purported pictures of Emulous Bob of K Pride, "the first certified meat sire of any breed," general information about the Southern Star operation, and copies of advertisements and articles appearing in the Aberdeen Angus Journal. [2]Southern Star held itself out as an Aberdeen Angus breeding operation. On May 5, 1973, petitioners signed the following documents: (1) Sales agreement; (2) Security agreement; (3) Management agreement; and (4) Subscription agreement. The Sales Agreement *28 provided in part that petitioners ("buyer") "hereby purchases and sellers hereby sells a unit of breeding cattle consisting of five (5) Exotic Bred [3] females, * * * (hereinafter referred to as the 'Basic Herd') * * *." The agreement stated that petitioners agreed to pay a total price of $36,000 for the Basic Herd consisting of $1,000 down payment payable on or before October 10, 1973, and a $35,000 nonrecourse note, secured by the cattle. The note was to provide for the payment of an interest rate of 6 percent. The agreement further provided, with respect to the purchase price of the cattle, as follows: Buyer agrees to release Seller of all obligations under the Sales and Management Agreements including those obligations listed herein, in the event Buyer desires to remove his Herd from Seller's care and maintenance. Seller agrees that upon written notice of the Buyer to remove his Herd from Seller's care and maintenance, and full payment of the Note due Seller, that Seller will arrange within thirty (30) days for the Herd to be prepared for shipment and delivery. Buyer will pay all costs of preparation and shipment. Seller agrees to reduce the purchase price of the Basic Herd *29 in the following manner: 1. If Buyer takes delivery of the Herd in 1973, the Note will be reduced by twenty-seven thousand ($27,000.00) dollars. 2. If Buyer takes delivery of the Herd in 1974, the Note will be reduced by eighteen thousand ($18,000.00) dollars. 3. If Buyer takes delivery of the Herd in 1975, the Note will be reduced by nine thousand ($9,000.00) dollars. All obligations under the Management Agreement will be prorated through the date of removal, and will be paid by the Buyer before the removal of the Herd. In the event the Buyer wishes to remove the Herd after January 1, 1976, then Buyer must complete payment of the Note and its obligations under the Management Agreement. When Buyer takes delivery of the Herd he will pay to Seller Fifty (50%) percent of the Herd value. Herd value will be the value of the Herd under normal marketing procedures. Herd value will satisfy Section 8, Part D of the Management Agreement. The Sales agreement further provided that: The animals in the Basic Herd are represented and warranted to be breeders capable of being registered with the various exotic cattle associations. The Herd will remain registered under the name of *30 Seller [Southern Star] or its nominee for benefit of Owner with the various exotic cattle associations. Petitioners registered the 5 exotic cows in their names on December 10, and 12, 1984. Under the Management agreement, Southern Star agreed "to breed, care for, maintain, feed, transport, and provide whatever is necessary, including, without limitation, medical services and facilities," to petitioners' herd. The term "herd" included not only the Basic Herd, but all progeny issuing therefrom. The Management agreement provided that, beginning with the 1974 calf crop, Southern Star would retain from each year's calf crop sufficient heifer calves to be added to the breeding herd, so that by December 31, 1979, petitioners' breeding herd would consist of at least 8 animals, and that the breeding herd was to be maintained at that level for the duration *31 of the contract. The agreement provided as follows with respect to Southern Star's discretion in managing the cattle: Subject to the express provisions contained herein, and so long as this Agreement is in effect and the Note (as defined in the Sales Agreement) or any part thereof remains unpaid, SOUTHERN STAR or any subsequent holder of the Note shall have full control of the location, maintenance, expansion, breeding and culling of the Herd which constitutes the collateral security for such Note, including, without limitation, the matters described in Section 7 above and the determination of the most opportune time for sales from the Herd. Upon any default by SOUTHERN STAR pursuant to the provisions of Section 17 below and the termination of this Agreement pursuant thereto, or upon payment of the Note in full, Owner shall have the right to enter into any management agreement with respect to the Herd which Owner, in his sole judgment or discretion, may decide. Southern Star agreed to advise petitioners on the maintenance, expansion and breeding of the herd, including the sale of animals, the retention of progeny, the incorporation of progeny in the breeding program, and the selling, *32 culling, or replacing of animals in the Basic Herd. The Management agreement provided as follows with respect to the sale of animals by Southern Star: All sales of animals made by SOUTHERN STAR for which full payment is to be received in less than fifteen (15) months shall not require the consent of the Owner. However, on any sales of animals by SOUTHERN STAR with an extension of credit of fifteen (15) months or more, SOUTHERN STAR shall obtain the consent of Owner, which consent shall not be unreasonably withheld. Southern Star guaranteed that, beginning May 1, 1974, the breeding herd should have an annual live calf birth rate of at least 80 percent and, if there was any shortfall, Southern Star would transfer to petitioners a sufficient number of animals of comparable value and quality to make up the deficiency. The animals so transferred were to consist of approximately half heifer calves and half bull calves. Under the agreement, Southern Star also guaranteed to replace any animal in the breeding herd dying before its tenth birthday with an animal similar in age, sex, and value to the replaced animal. An 80 percent live calf drop is common in the cattle breeding industry, *33 and a guarantee of said percentage adds no additional value to a cow. The calving rate of purebred cattle that are to be sold as breeding stock is approximately 90 percent.In the case of commercial herds the composite rate is 80 percent. Southern Star was obligated, under the Management agreement, to deliver to petitioners yearly reports detailing the chain number, ear tattoo number, and location of each of their animals, and to maintain and keep books and records covering the registration certificates on all animals owned by petitioners, of all sales of animals in their herd, of all deaths of animals in their herd, of substitutions and replacements made to the herd and records concerning breeding. The Management agreement provided that either party had the option to liquidate the herd when the principal owed on the purchase note was reduced to $15,000 or less. However, Southern Star had the option to liquidate at any time so long as it gave written assurance that the net liquidation proceeds would be equal to at least three times the remaining balance owed on the principal of the purchase note. The Management agreement was to terminate in any case upon liquidation of the herd, *34 but Southern Star had the option to terminate it at any time after the purchase note was fully paid or if there was a failure by a purchaser to cure any default in payment within 10 days after such default. Petitioners agreed to pay Southern Star the following amounts as management fees and pasture rentals: (1) In 1973, for maintenance of and pasture rental for the Herd, the sum of five thousand ($5,000.00) dollars on December 5, 1973. (2) In 1974, for maintenance of and pasture rental for the Herd, the sum of five thousand ($5,000.00) dollars to be paid at the rate of four hundred sixteen dollars and sixty-seven cents ($416.67) per month, commencing the first day of January, 1974. (3) In 1975, for maintenance of and pasture rental for the Herd, the sum of three thousand ($3,000.00) dollars to be paid at the rate of two hundred fifty dollars and no cents ($250.00) per month, commencing the first day of January, 1975. (4) In addition to the foregoing, SOUTHERN STAR was to receive fifty (50%) percent of all net proceeds (gross sales price less commissions, sales costs and brokerage fees). The Sales and Management agreements provided that the said agreements constituted the *35 entire understanding between the parties and could not be terminated orally. Both of the agreements further provided that petitioners were: fully aware of the speculative nature of purchasing and managing breeding cattle and represent that [their] financial circumstances are consistent with this investment and that [they are] sophisticated investors and by reason of [their] business and financial experience, [they have] the capacity to protect [their] own interests in connection with [their] investment. [4]
On December 29, 1973, petitioner executed a promissory note in the amount of $35,000. The note was payable as follows: (1) interest on the entire unpaid principal balance of the note, computed at the rate of six (6%) percent per annum, was to be paid on January 1, 1974, and on the first day of each and every succeeding month through and including December 1, 1975, (2) an amount equal to thirty (30%) percent of the total net proceeds resulting from the sale of animals in the herd (gross sales price less commissions, sales costs and brokerage fees) from time to time as such animals were sold; *36 all funds were to be applied toward the reduction of principal, until the Note was paid in full, (3) interest at the rate of six (6%) percent per annum upon the unpaid balance of the promissory note accruing after December 1, 1975, was to be paid to the seller from the remainder of petitioners' share of the proceeds realized from the sale of animals in the herd subsequent to December 1, 1975. In the event that such proceeds were insufficient to pay accumulated interest, any deficiency was to be carried forward and charged against the remainder of petitioners' share of the proceeds realized from future sales. The promissory note provided that petitioners had "no personal liability of any kind whatsoever" under the note and "no personal liability for any deficiency." The promissory note and the Security agreement stated that the sole collateral for the nonrecourse note was the herd, viz, the basic herd and all progeny issuing therefrom. Petitioners did not make any cash payments on the promissory note. Petitioners relied on Harry Epstein to select the cows they were purportedly purchasing; they never saw the cows. Petitioners did not inquire as to the amounts paid by Southern Star *37 for the original five cows. Prior to participating in Southern Star, and during the years in issue, petitioners never hired an outside cattle appraiser, nor did they subscribe to any cattle breeding publications. Petitioners did not have any expertise in cattle breeding, and Isabel did not know the difference between Simmental and Angus cows. Neither the Sales nor the Management agreement gave petitioners the right to pick the cattle they were agreeing to acquire. Petitioners visited Southern Star's office in Miami, Florida, about once a year during the years in issue, but they never visited any of the ranches. Petitioners' purported herd was located in Missouri. On May 14, 1975, the U.S. District Court for the Southern District of Florida entered an Order, pursuant to a consent decree, permanently enjoining Southern Star (1) from selling securities without a valid registration statement, in violation of sections 5(a) and 5(c) of the Securities Act of 1933, and (2) from violating section 10(b) of the Securities Exchange Act of 1934 and section 17(a) of the Securities Act of 1933 by making misleading statements pertaining to the risks inherent in the cattle breeding program and *38 in tax shelter investments generally, the financial condition of Southern Star, the markup charged by Southern Star on sales of cattle to investors, and the potential conflict of interest between Southern Star and investors arising from Southern Star's right to sell an investor's cattle without the investor's approval. The injunction was issued pursuant to Southern Star's stipulation and consent, in which it agreed, without admitting or denying the allegations contained in the complaint, to the entry of the permanent injunction. Southern Star further agreed to file a registration statement with the Securities Exchange Commission and to transmit a copy of its final prospectus, together with copies of the complaint and order of permanent injunction, to every person who had ever invested in Southern Star. Petitioners received the following letter, dated May 7, 1976, from Southern Star: Dear Herdowner: You are now in either your fourth or fifth year of cattle breeding with Southern Star and as you know Uncle Sam requires that you show a profit during two out of five years to meet the requirements of the Hobby Loss rule. We are now preparing to sell animals so that this profit *39 requirement can be met. We take great pride in the herd we have been developing in the past few years. We have culled the herd systematically and have developed a fine breeding herd. Southern Star does not desire to sell specific animals in your herd to other breeders, and would like to retain them for our own breeding herd. We have evaluated these animals and have determined their estimated value to us. We have enclosed a list of these animals and their estimated prices. Southern Star requests to purchase these animals from you and agrees to waive its Maintenance and Interest proceeds received from such sales and will apply the entire proceeds to this sale to reduce your mortgage. If the animals Southern Star requests to purchase include any basic herd animals, we have shown a tax analysis of the transaction. If you agree to the above, please sign the enclosed list and return immediately. If you have any questions please contact me. Sincerely, SOUTHERN STAR LAND & CATTLE CO., INC.
/s/ M. F. Haskell, Comptroller Attached to the May 7, 1976 letter was an addendum which stated, in pertinent part, as follows: I agree to sell the following Animals to Southern *40 Star Land & Cattle Co., Inc.
Ear Tag
Date of
Number
Birth
Amount
9825
4/9/75
1,800.00
9811
3/3/75
1,800.00
Petitioners agreed to the proposed purchase of the cows by Southern Star. Each year Southern Star provided petitioners and their accountant with sample tax forms detailing the recommended Federal tax reporting of petitioners' cattle investments. In the purebred cattle breeding business, the maintenance of careful records on each cow is very important. A "cow card" is a production record of a particular cow showing the date of birth or when it entered the herd, when it was bred, what bull it was bred to, when it calved, any difficulties in calving, vaccinations and medical treatments it had, and when sold to a third party. A registration certificate shows the background of an animal from a genetic point of view, viz, the sires and the dams back two generations. The cow cards for the five exotic cows designated as petitioners' by Southern Star indicate that KVR Miss Polar 240 and KVR Miss Polar 238 were covered by "neighbors bulls," and that Miss KVR Elephant 276D, and Miss KVR Decor 264D were exposed to the herd sires from July 30, 1975 and *41 September 9, 1974, respectively. The herd sire breeds were Simmental, Chianina, and Limousin. The success rate in producing a prize cow is very low. Petitioners were aware of the fact that the probabilities of obtaining a prize animal were remote, almost nil. Only cows of exceptional quality command top prices. Southern Star substituted five Angus cows for petitioners' purported Exotic Bred cows in 1977, as follows: Five Original
Substituted Animals as of
Cows
December 31, 1977
Ear Tag
Name of Cow
Ear Tag
Name of Cow
3525
Miss KVR Decor 264D
9440
Miss Star Sun Up 6V13
3528
Miss KVR Elephant 276D
9459
Miss Star Challenger 7V51
3532
Miss KVR Decor 296D
13383
Erica Momentum of SS F1WR
3515
KVR Miss Polar 238
33343
Erica Catalyst of SS Z1NT
3517
[5] KVR Miss Polar 240 33325
Eline Catalyst of SS Z1WX
This substitution was without petitioners' authorization. In the cattle breeding industry, it is not normal for a cattle manager to substitute other cows under his care for an owner's cows without first receiving the owner's permission. Petitioners took no legal action against Southern Star to obtain either the return *42 of the five Exotic Bred cows or damages. The average sales prices of half-blood Simmentals, according to SimmentalShield, the Simmental Associations' monthly publication, were as follows from September 1972 to September 1973. Sept.
Oct.
Nov.
Dec.
Jan.
Feb.
Mar.
1972
1972
1972
1972
1973
1973
1973
Open
$765
$682
$654
$748
$760
$982
Bred
$1,044
1,472
1,284
1,424
1,893
1,721
1,883
With heifer
calf
4,249
2,691
3,408
5,279
4,300
3,760
With bull
calf
1,333
1,514
1,950
Apr.
May
Jun.
Jul.
Aug.
Sept.
1973
1973
1973
1973
1973
1973
Open
$937
$1,007
$1,020
$1,320
Bred
1,881
1,592
1,527
1,994
1,994
2,007
With heifer
calf
4,507
3,898
3,851
3,794
3,794
4,694
With bull
calf
1,882
2,010
1,419
1,838
*43 The average sales prices of half-blood Simmentals according to SimmentalShield were as follows from May 1976 to June 1977: May
Jun.
Jul.
Aug.
Sept.
Oct.
Nov.
1976
1976
1976
1976
1976
1976
1976
Open
$436
$436
$311
$470
$271
$292
Bred
394
394
477
484
355
386
With heifer
calf
579
579
693
776
478
544
With bull
calf
542
542
603
860
474
Dec.
Jan.
Feb.
Mar.
Apr.
May
Jun.
1976
1977
1977
1977
1977
1977
1977
Open
$289
$307
$388
$301
$675
$326
$292
Bred
394
407
479
348
465
416
422
With heifer
calf
591
450
540
495
607
With bull
calf
1,035
436
430
360
530
The original five exotic cows were sold by Southern Star to third parties, as follows: Name of Cow
Purchaser
Date Sold
[6] Sale Price Miss KVR Decor 264D
El Dorado Livestock Auction
5/28/77
245.26
Miss KVR Elephant 276D
El Dorado Livestock Auction
5/28/77
257.44
Miss KVR Decor 296D
Emporia Livestock Sales Co.
5/24/77
301.19
KVR Miss Polar 238
Emporia Livestock Sales Co.
5/22/77
253.00
KVR Miss Polar 240
Emporia Livestock Sales Co.
7/16/76
240.32
*44 A cow is at its peak breeding age at 5 years of age. The five original exotic cows were approximately 5 years old when sold by Southern Star to third parties. Petitioners reported income from alleged sales for the years and in the amounts as follows: Third party sales
Sales to Southern Star
Year
No. of animals/Total Price
No. of animals/Total Price
[7] Total 1973
0/$0  0/$0  $0 1974
0/0   0/0  0 1975
3/204.92
0/0  205
1976
2/223.31
2/3,600
3,823
1977
4/530.34
1/2,600
3,130
1978
1/247.78
248
Petitioners reported total income from purported sales and claimed total deductions with regard to their Southern Star investment for the years and in the amounts as follow: 1973
1974
1975
1976
1977
Income
$ 0    $ 0   $ 205 $3,823
$3,130
Depreciation
13,143 6,531 4,665 3,332
2,380
Interest
1,420 2,100 2,100 45
106
Maintenance fee
5,710 5,000 3,102 112
265
& Pasture rental
Net Total
$ (20,273)
$ (13,631)
$ (9,662)
$ 334
$ 379
*45 1978
1979
1980
1981
Total
Income
$ 248 $355
$353 $54,553 $ 62,667 Depreciation
1,700 106
173 32,030 Interest
50 71
71 9,089 15,052 Maintenance fee
124 178
177 52,563 67,231 & Pasture rental
Net Total
$ (1,626)
0  $ (68)
$ (7,099)
$ (51,646)
During the years in issue, petitioners claimed deductions with respect to their investment in Southern Star in the amount of $49,134, and reported total income in the amount of $4,276. Petitioners also claimed an investment tax credit, for their taxable year 1973, in the amount of $2,520, and expenses related to Jerry's visits to Southern Star's office in Miami, Florida in the amount of $566, $1,207, $1,234, and $391 for their taxable years 1973, 1974, 1975, and 1976, respectively. Petitioners' out of pocket expenses in connection with their Southern Star investment did not exceed $20,430. Respondent disallowed all deductions and credits claimed by petitioners, for the years 1973, 1974, 1975, 1976, and 1978, for their cattle investments with Southern Star. Respondent's disallowance was based on his determination as follows: I. All items of *46 income, loss, deduction and credit claimed on your return relating to your cattle breeding activities are disallowed since it is determined that you were not the owner of the cattle during the years in issue. II. If it is determined that you were the owner of the cattle during the years in issue, then your items of loss, deduction and credit are limited as follows: (1) Depreciation: Your depreciable basis in the cattle is limited to your actual cash investment in the cattle since the non-recourse loan is contingent and not a present liability under section 163. Your basis in the cattle is further limited to no more than the fair market value of the cattle at their time of purchase.See section II(2), below. The allowable depreciation is limited to use of the 150 percent declining balance method. (2) Intangible Assets: Any amount actually paid in excess of the fair market value of the cattle is allocated to one or more intangible assets with indeterminable useful lives. No depreciation or amortization is allowed with respect thereto. (3) Investment Credit: Your claimed investment credit is not allowable since your cattle breeding activities were not engaged *47 in for profit under section 183, see section III, below. If your cattle breeding activities were engaged in for profit, your investment credit is limited to the amount determined by reference to your depreciable basis as determined in section II(1), above. (4) Interest: Your claimed interest deductions are disallowed since the non-recourse loan is contingent and not a present liability under section 163. (5) Management Fees: The Maintenance and Pasture Rental fees claimed on your return are disallowed since the amounts claimed are unreasonable and represent prepaid management fees which must be capitalized. Since the management contract has no determinable useful life, no amortization deduction is allowable with respect to the capitalized management fees. III. Any deduction for depreciation or management fees allowable under section II, above, and any other allowable item of deduction referred to in section 183(b)(2) is further denied in an amount equal to the excess, if any, of your income from your cattle breeding activities over these deductions allowable under section 183(b)(1), since it is determined that your cattle breeding activities were not engaged in for *48 profit within the meaning of section 183(a). In addition, no investment credit is allowable since your activities were not engaged in for profit and the cattle were not property which is subject to an allowance for depreciation. IV. Alternatively, any deduction with respect to your cattle breeding activities with Southern Star Land & Cattle Co. is limited to your amount "at-risk" as determined under section 465 and the regulations applicable thereto. OPINION Respondent's primary contention is that despite the terms contained in the various documents executed by petitioners and Southern Star, the transaction did not in fact transfer the benefits and burdens of ownership of the cattle to petitioners. Respondent contends, further, that this and the gross disparity between the purported purchase price and the fair market value of the cattle indicate that petitioners did not make a real economic investment in the cattle and that the transaction is a sham. Petitioners predictably argue otherwise. Before we decide this issue, however, we must address a threshold issue raised by petitioners. Petitioners assert that the statutory notice of deficiency did not encompass the sham *49 transaction theory, the substance-over-form theory, or any other theories or issues on which Hunter v. Commissioner,T.C. Memo. 1982-126, was decided [8] and, therefore, respondent bears the burden of proof as to facts relevant to these theories and/or issues. Petitioners argue, further, that respondent is attempting to apply some sort of hybrid collateral estoppel theory, "without the filing of a required pleading to place an affirmative defense in issue," in asserting the applicability of Hunter to the facts of the instant case. *50 Generally, the burden of proof is on the taxpayer. Welch v. Helvering,290 U.S. 111 (1933), Rule 142(a). [9]Rule 142(a) provides, in pertinent part, that: The burden of proof shall be upon the petitioner, except as otherwise provided by statute or determined by the Court; and except that, in respect of any new matter, increases in deficiency, and affirmative defenses, pleaded in his answer, it shall be upon the respondent. * * * [Emphasis added.] In Achiro v. Commissioner,77 T.C. 881, 890 (1981), we stated: The assertion of a new theory which merely clarifies or develops the original determination without being inconsistent or increasing the amount of the deficiency is not a new matter requiring the shifting of the burden of proof. Estate of Jayne v. Commissioner,61 T.C. 744, 748-749 (1974); McSpadden v. Commissioner,50 T.C. 478, 492-493 (1968); Estate of Sharf [sic] v. Commissioner,38 T.C. 15, 27-28 (1962) *51 [affd. 316 F.2d 625 (7th Cir. 1963)]. However, if the assertion in the amended answer either alters the original deficiency or requires the presentation of different evidence, then respondent has introduced a new matter. Estate of Falese v. Commissioner,58 T.C. 895, 898-899 (1972); McSpadden v. Commissioner,supra;Papineau v. Commissioner,28 T.C. 54, 57 (1957); Tauber v. Commissioner,24 T.C. 179, 185 (1955). * * * It is clear from a reading of respondent's theory, as set forth in the statutory notice of deficiency and in our findings of fact, supra, that there is no new matter or theory being enunciated by him. Even assuming, arguendo, that the theories of sham transaction, form-over-substance, and the Hunter case are not implicit in respondent's determination that petitioners did not own the cattle during the years in issue, the assertion of these "new" theories does not require the presentation of different or additional evidence by petitioners. It follows that there is no shift of the burden of proof, viz, petitioners bear the burden on all the issues presented herein. *52 Achiro v. Commissioner,supra.See Stewart v. Commissioner,T.C. Memo. 1982-209, affd. 714 F.2d 977, 990-991 (9th Cir. 1983). Compare Siegel v. Commissioner,T.C. Memo. 1985-441. Petitioners' argument with regard to respondent's assertion of the collateral estoppel theory is equally meritless and must be rejected. Respondent does not argue that the elements for the application of the collateral estoppel theory are present in this case, rather his contention is that the Hunter case is so directly on point that it constitutes a clear precedent. The factual pattern in this case is substantially similar to that in Hunter v. Commissioner,supra, which case, respondent argues, is controlling. Petitioners argue that the only fact identical in Hunter and the instant case is that the cattle were purchased from and managed by Southern Star. Petitioners stipulated, orally, that the operative provisions of the documents pertaining to the transaction between the taxpayer and Southern Star in Hunter are, except for the dollar amounts, the names of the parties, and types of cows, identical *53 to the ones in the present case. Similarly, the issues presented in both cases are essentially the same. We do not think that the aspects in which the facts of this case differ from the facts in Hunter warrant a decision contrary to Hunter.
In Hunter v. Commissioner,supra, we noted that "the mere signing of papers calling a transaction by a certain designation does not cause the transaction to acquire that status for Federal income tax purposes," and held that the purported sale of cattle was so lacking in economic substance as to preclude being treated as such for tax purposes. We noted that the determination of whether a transaction denominated in documents signed by the taxpayer as a sale constituted a sale for tax purposes had to be made on the basis of the entire provisions of the documents and all other evidence of record. This Court considered, inter alia, the following factors: (1) whether the stated price for the cattle was within a reasonable range of its value; (2) whether petitioners had any control over the cattle purportedly purchased and, if *54 so, to what extent; (3) whether there was any intent that the stated purchase price of the cattle would ever be paid; and (4) whether the petitioners would receive any benefit from the disposition of the cattle. See Houchins v. Commissioner,79 T.C. 570 (1982); Siegel v. Commissioner,supra.All such factors, on the facts, were resolved adversely to the taxpayers. No extended discussion here is necessary. The operative facts are not distinguishable, the applicable legal principles are the same, and the result in the instant case is the same as it was in Hunter v. Commissioner,supra, and for the reasons therein stated. We are satisfied that petitioners knew what they were getting into, viz, they were not purchasing cattle or securing maintenance for such animals but were purely and simply purchasing a package of tax benefits. On the facts presented herein we conclude that petitioners are not entitled to the amounts claimed as depreciation, interest expense, or maintenance fees since they made no purchase of cattle. Hunter v. Commissioner,supra;Houchins v. Commissioner,supra. *55 See also Siegel v. Commissioner,supra;Estate of Franklin v. Commissioner,544 F.2d 1045, 1048 (9th Cir. 1976), affg. 64 T.C. 752 (1975). Since no sale of cattle was in substance made to petitioners, the nonrecourse note was not valid indebtedness, interest on which is deductible. Estate of Franklin v. Commissioner,supra.It follows that petitioners are not entitled to an investment credit with respect to the cattle assigned to them by Southern Star. Petitioners attempt to distinguish this case from Hunter on the basis of their lack of sophistication with regard to tax matters, this Court's findings in Hunter that the taxpayers did not attempt to acquire any knowledge of cattle breeding, and received their information about Southern Star from persons engaged in the procurement of tax shelters. With the possible exception of petitioners' visits to Southern Star's offices in Florida, there is no difference between the facts in Hunter and those of the case herein. Contrary to petitioners' assertions, we did not rely, in Hunter, on the taxpayers' tax expertise in determining that the *56 transaction between them and Southern Star was devoid of economic substance. We did note that "[b]oth Mr. Hunter and Mr. Waronker are sophisticated individuals with a wealth of education, training, and practical business experience." We do not think, however, that this is an adequate basis to reach a different result herein. Petitioner is a doctor in medicine, and Isabel is a teacher, individuals with a high level of formal instruction. If they felt insecure about their investment in cattle, it was within their discretion to resort to an experienced cattle breeder. It is clear from the record that petitioners never visited any of Southern Star's ranches. Petitioners make additional contentions which are meritless and deserve no further discussion. To reflect the foregoing, Decision will be entered for the respondent.
Footnotes
1. As used in this opinion, terms such as "interest," "management fees," "purchase," "petitioners' herd," "investment," "principal," and "down payment" should not be construed as carrying any conclusion as to the legal effect of the transactions or doduments involved.↩
*. For 1973 only↩
2. Petitioners were not provided with a copy of a prospectus for 1973. The record contains copies of the prospectuses for the years 1975, 1976, 1977, and 1978.↩
3. Within the cattle breeding industry, "exotic" means imported from Europe or progeny of imported animals. "Bred" means that the animal should be pregnant. It seems, however, that only one of the cows was pregnant at the time of the transaction herein, two had been covered, and the other two were covered shortly thereafter.↩
4. A similar statement was contained in the Subscription agreement.↩
5. According to the Herd Status Report dated December 31, 1976, KVR Miss Polar 240 was replaced by Miss Star 3736.The December 31, 1977 Herd Status Report further states that all of petitioners' cows except KVR Miss Polar 238 were substituted by other cows in June 1977. These cows were, in turn, substituted by the cows indicated in our findings of fact, supra.↩
6. The record does not indicate the original prices paid for the five exotic cows acquired by Southern Star from Kingview Ranch in Marshfield, Missouri, and later sold to petitioners.↩
7. Rounded to the nearest number. The breakdown of the sales for the years 1979 through 1981 is not in evidence.↩
8. During trial, and on brief, reference was made to the "sham transaction" theory, the "substance-over-form" theory and the theories of Hunter-Waronker. These various approaches overlap significantly and the various designations were often used interchangeably. The parties stipulated that the operative documents pertaining to the transaction between the taxpayer and Southern Star in Hunter v. Commissioner,T.C. Memo. 1982-126, with the exception of the dollar amounts, names of the parties, and types of cows, are identical to the documents in the present case. We note that the transaction herein is virtually identical to that in Waronker v. Commissioner, the companion case to Hunter v. Commissioner,supra.↩
9. All Rule references are to the Tax Court Rules of Practice and Procedure, except as otherwise noted.↩